# ATTACHMENT A

# EXCERPTS FROM CONSENT DECREE IN
## *UNITED STATES V. GENERAL ELECTRIC CO.*
## (N.D.N.Y., ENTERED NOV. 2, 2006)

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

Plaintiff,

v.

GENERAL ELECTRIC CO.,

Defendant.

CIVIL ACTION NO. 1:05 CV-01270

CONSENT DECREE

## TABLE OF CONTENTS

I. BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II. JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

III. PARTIES BOUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

IV. DEFINITIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

V. GENERAL PROVISIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

VI. PERFORMANCE OF THE WORK BY SETTLING DEFENDANT . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

VII. REMEDY REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

VIII. QUALITY ASSURANCE, SAMPLING, AND DATA ANALYSIS . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

IX. ACCESS AND INSTITUTIONAL CONTROLS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

X. REPORTING REQUIREMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

XI. EPA APPROVAL OF PLANS AND OTHER SUBMISSIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

XII. PROJECT COORDINATORS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

XIII. ASSURANCE OF ABILITY TO COMPLETE WORK . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

XIV. CERTIFICATION OF COMPLETION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

XV. EMERGENCY RESPONSE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

XVI. PAYMENTS FOR RESPONSE COSTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

XVII. INDEMNIFICATION AND INSURANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

XVIII. FORCE MAJEURE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

XIX. DISPUTE RESOLUTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

XX. STIPULATED PENALTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

XXI. COVENANTS NOT TO SUE BY PLAINTIFF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

XXII. COVENANTS BY SETTLING DEFENDANT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

XXIII. EFFECT OF SETTLEMENT; CONTRIBUTION PROTECTION . . . . . . . . . . . . . . . . . . . . . . . . . . 67

XXIV. CERTIFICATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

XXV. ACCESS TO INFORMATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

XXVI. RETENTION OF RECORDS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

XXVII. NOTICES AND SUBMISSIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

XXVIII. EFFECTIVE DATE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

XXIX. RETENTION OF JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

XXX. APPENDICES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

XXXI. COMMUNITY RELATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

XXXII. MODIFICATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

XXXIII. LODGING AND OPPORTUNITY FOR PUBLIC COMMENT . . . . . . . . . . . . . . . . . . . . 75

XXXIV. SIGNATORIES/SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

XXXV. FINAL JUDGMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

R.      Solely for the purposes of Section 113(j) of CERCLA, the Remedial Action selected by the ROD and the Work to be performed by the Settling Defendant shall constitute a response action taken or ordered by the President.

S.      The Parties recognize, and the Court by entering this Consent Decree finds, that this Consent Decree has been negotiated by the Parties in good faith and implementation of this Consent Decree will expedite the cleanup of the Site and will avoid prolonged and complicated litigation between the Parties, and that this Consent Decree is fair, reasonable, and in the public interest.

NOW, THEREFORE, it is hereby Ordered, Adjudged, and Decreed:

## II. Jurisdiction

1.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1345, and 42 U.S.C. §§ 9606, 9607, and 9613(b).  This Court also has personal jurisdiction over the Settling Defendant.  Solely for the purposes of this Consent Decree and the underlying complaint, Settling Defendant waives all objections and defenses that it may have to the jurisdiction of the Court or to venue in this District.  Settling Defendant shall not challenge the terms of this Consent Decree or this Court's jurisdiction to enter and enforce this Consent Decree.

## III. Parties Bound

2.      This Consent Decree applies to and is binding upon the United States and upon Settling Defendant and its successors and assigns.  Any change in ownership or corporate status of the Settling Defendant, including, but not limited to, any transfer of assets or real or personal property, shall in no way alter the Settling Defendant's responsibilities under this Consent Decree.

3.      Settling Defendant shall provide a copy of this Consent Decree to each contractor hired to perform the Work (as defined below) required by this Consent Decree and to each entity representing Settling Defendant with respect to the Work and shall condition all contracts entered into hereunder upon performance of the Work in conformity with the terms of this Consent Decree and applicable law.  Settling Defendant or its contractors shall provide written notice of the Consent Decree to all subcontractors hired to perform any portion of the Work required by this Consent Decree.  Settling Defendant shall nonetheless be responsible for ensuring that its contractors and subcontractors perform the Work contemplated herein in accordance with this Consent Decree; provided, however, that for the purposes of this sentence, rail carriers shall not be considered contractors or subcontractors to Settling Defendant.  Notwithstanding the proviso in the preceding sentence, Settling Defendant shall remain responsible for ensuring that the sediments dredged in connection with the Remedial Action are properly disposed of at an approved off-site facility.  With regard to the activities undertaken pursuant to this Consent Decree, each contractor and subcontractor shall be deemed to be acting in connection with a contractual relationship with the Settling Defendant within the meaning of Section 107(b)(3) of CERCLA, 42 U.S.C. § 9607(b)(3).

IV. DEFINITIONS

4.     Unless otherwise expressly provided herein, terms used in this Consent Decree which are defined in CERCLA or in regulations promulgated under CERCLA shall have the meaning assigned to them in CERCLA or in such regulations as of the Effective Date of this Consent Decree.  Whenever terms listed below are used in this Consent Decree or in the appendices attached hereto and incorporated hereunder, the following definitions shall apply:

"Approved Design Documents" shall mean the detailed plans and specifications for the Remedial Action that are approved by EPA pursuant to the RD AOC.  The Approved Design Documents are to include the Phase 1 Final Design Report, the Phase 2 Final Design Report, the Remedial Action Community Health and Safety Plans, the Environmental Monitoring Plans for Phases 1 and 2 of the Remedial Action, and any EPA-approved revisions or addenda to such documents.

"ATSDR" shall mean the Agency for Toxic Substances and Disease Registry.

"CERCLA" shall mean the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. §§ 9601 - 9675.

"Certification Unit" shall mean an area developed in accordance with EPA's April 2004 *Engineering Performance Standard for Dredging Residuals* (and as such areas may be modified, if at all, for Phase 2) for the post-dredging sampling program and the subsequent statistical evaluation of post-dredging surface sediment data.

"Consent Decree" shall mean this Consent Decree and all appendices attached hereto (listed in Section XXX).  In the event of conflict between the body (i.e., Sections I-XXXV) of this Consent Decree and any appendix, the body of this Consent Decree shall control.

"Day" shall mean a calendar day unless expressly stated to be a working day.  "Working day" shall mean a day other than a Saturday, Sunday, or Federal holiday.  In computing any period of time under this Consent Decree, where the last day would fall on a Saturday, Sunday, or Federal holiday, the period shall run until the close of business of the next working day.

"Effective Date" shall be the effective date of this Consent Decree as provided in Paragraph 127.

"EPA" shall mean the United States Environmental Protection Agency and any successor departments or agencies of the United States.

"EPA Phase 1 Evaluation Report" shall mean the report to be prepared by EPA as described in subparagraph 13.b.

"Existing Contamination" shall mean any hazardous substances, pollutants or contaminants, present or existing on or under the Sediment Processing/Transfer Facility Property(ies) as of the date of signature of this Consent Decree by Settling Defendant, except that Existing Contamination does not include PCBs that moved from the Hudson River onto such Property(ies) as a result of natural forces.

"Federal Trustees for Natural Resources" shall mean the National Oceanic and Atmospheric Administration of the U.S. Department of Commerce, and the United States Fish and Wildlife Service and the National Park Service of the U.S. Department of the Interior.

"Fish Consumption Advisories and Fishing Restrictions" shall mean institutional controls that are required by the ROD and are implemented and/or modified by the responsible governmental authorities, including NYSDOH or other agency of the State, and that establish health advisories concerning PCBs and are related to the consumption of fish from the Hudson River and health-based restrictions related to fishing in the Hudson River.

"GE Phase 1 Evaluation Report" shall mean the report to be prepared by Settling Defendant pursuant to subparagraph 13.b.

"Institutional Controls" shall mean administrative and/or legal tools that limit land or resource use or otherwise help to minimize the potential for human exposure to contamination and protect the integrity of the remedy. Institutional controls may include, but are not limited to, informational tools (such as fish consumption advisories), governmental controls (such as bans on fishing for consumption purposes), proprietary controls (such as easements and/or restrictive covenants), and contractual agreements.

"Interest" shall mean interest at the rate specified for interest on investments of the EPA Hazardous Substance Superfund established by 26 U.S.C. § 9507, compounded annually on October 1 of each year, in accordance with 42 U.S.C. § 9607(a). The applicable rate of interest shall be the rate in effect at the time the interest accrues. The rate of interest is subject to change on October 1 of each year.

"Interim Response Costs" shall mean all direct and indirect costs (a) paid by EPA, or by the U.S. Department of Justice on behalf of EPA, in connection with the Site between July 1, 2004 (or June 27, 2004 with respect to EPA payroll costs and July 25, 2004 with respect to U.S. Department of Justice costs) and the Effective Date, or (b) incurred by such parties in connection with the Work Area prior to the Effective Date but paid after that date.

"Lower Hudson River" shall mean the Hudson River from the Federal Dam in Troy, New York (River Mile 153.9) downstream to the Battery in New York City.

"Managing Contractor(s)" shall mean the contractor(s) retained by Settling Defendant to assist it in managing the implementation of the Work under this Consent Decree.

"National Contingency Plan" or "NCP" shall mean the National Oil and Hazardous Substances Pollution Contingency Plan promulgated pursuant to Section 105 of CERCLA, 42 U.S.C. § 9605, codified at 40 C.F.R. Part 300, and any amendments thereto.

"Non-Capped Phase 1 Costs" shall mean all direct and indirect costs, not inconsistent with the NCP, that EPA, or the U.S. Department of Justice on behalf of EPA, incurs: (1) to enforce this Consent Decree prior to the Phase 2 Election Date; and (2) to enforce any surviving obligations Settling Defendant has under the Consent Decree in the event that Settling Defendant notifies EPA pursuant to subparagraph 15.c., below, that Settling Defendant will not implement Phase 2 of the Remedial Action pursuant to this Consent Decree.

"Non-Capped Phase 2 Costs" shall mean all direct and indirect costs, not inconsistent with the NCP, that EPA, or the U.S. Department of Justice on behalf of EPA, incurs for one or more of the following purposes between the Phase 2 Election Date and the date of Certification of Completion of the Remedial Action pursuant to Paragraph 57, below: (a) to enforce this Consent Decree; (b) to engage in dispute resolution activities pursuant to Section XIX (Dispute

Resolution); (c) to take actions pursuant to Section XV (Emergency Response); and (d) to acquire real property interests, or to assist in the acquisition of real property interests, needed for the Remedial Action (including, but not limited to, the cost of attorney time and just compensation paid in connection with acquiring such real property interests).

"NYSDEC" shall mean the New York State Department of Environmental Conservation and any successor departments or agencies of the State.

"NYSDOH" shall mean the New York State Department of Health and any successor departments or agencies of the State.

"Operation, Maintenance and Monitoring" or "OM&M" shall mean all activities required to monitor and maintain the effectiveness of the Remedial Action in accordance with the Operation, Maintenance and Monitoring plans that are required pursuant to the SOW and approved by EPA, and all other activities required pursuant to those plans.

"Paragraph" shall mean a portion of this Consent Decree identified by an arabic numeral or an upper case letter.

"Party" or "Parties" shall mean the United States and/or the Settling Defendant.

"Past Response Costs" shall mean all direct and indirect costs not previously reimbursed by Settling Defendant, that EPA, the U.S. Department of Justice on behalf of EPA, or ATSDR, paid at or in connection with the Site through June 30, 2004 (or June 26, 2004 with respect to EPA payroll costs and July 24, 2004 with respect to U.S. Department of Justice costs), plus Interest on all such costs which has accrued pursuant to 42 U.S.C. § 9607(a) through such date.

"Peer Review" shall mean the independent external peer review conducted in accordance with Paragraph 14 of this Consent Decree.

"Phase 1" shall mean all parts of the Remedial Action that are needed for the implementation and evaluation of the first construction season of remedial dredging at the Work Area. Phase 1 includes, but is not limited to, the dredging conducted during that season, the construction of the Sediment Processing/Transfer Facility(ies) needed for Phase 1 dredging, the processing and off-site disposal of such dredged sediments, the preparation and finalization of the Phase 1 Evaluation Reports, and the Peer Review.

"Phase 1 Engineering Performance Standards" shall mean the performance standards for dredging-related resuspension, dredging residuals and dredging productivity, including the associated action levels and sampling, monitoring, contingency, record keeping and/or reporting elements of those standards, that are set forth in EPA's April 2004 *Engineering Performance Standards* for the Site, as modified by the Performance Standards Compliance Plan Scope and the Remedial Action Monitoring Scope, which are attachments to the Statement of Work at Appendix B of this Consent Decree.

"Phase 1 Quality of Life Performance Standards" shall mean the performance standards for air quality, noise, odor, lighting and navigation, including the associated action levels and sampling, monitoring, contingency, record keeping and/or reporting elements of those standards, that are set forth in EPA's May 2004 *Hudson River PCBs Superfund Site Quality of Life Performance Standards*, as modified by the Performance Standards Compliance Plan Scope and the Remedial Action Monitoring Scope.

"Phase 1 RA Response Costs" shall mean all direct and indirect costs, not inconsistent with the NCP, that EPA, or the U.S. Department of Justice on behalf of EPA, or ATSDR, incurs prior to the Phase 2 Election Date, in connection with (a) reviewing or developing plans, reports and other items pursuant to this Consent Decree, verifying or overseeing the Work, or otherwise implementing or overseeing this Consent Decree; (b) conducting any other activities related to the Work, including but not limited to community relations activities (including the cost of maintaining EPA's Hudson River Field Office); (c) obtaining access for the Work required hereunder, or property interests for or relating to the Sediment Processing/Transfer Facility(ies) needed for the Remedial Action; (d) Institutional Controls relating to the Site; and (e) performing any other activities related to the Remedial Action, including but not limited to (i) preparation of EPA's Phase 1 Evaluation Report, and the Peer Review of the Phase 1 Evaluation Reports, (ii) evaluation of remedial operations with respect to the Phase 1 Engineering Performance Standards and the Phase 1 Quality of Life Performance Standards; and (iii) developing, evaluating and/or requiring adjustments to the remedial operations, the Phase 1 Engineering Performance Standards, the Phase 1 Quality of Life Performance Standards, and/or to the scope of Phase 2. Phase 1 RA Response Costs shall also include all Interim Response Costs, and all RD Response Costs, as defined in the RD AOC, which have not already been reimbursed by Settling Defendant and are not otherwise included within the definition, above, of Interim Response Costs. Phase 1 RA Response Costs include, but are not limited to, payroll costs, contractor costs (including annual allocation costs), interagency agreement costs, travel costs, laboratory costs, and the costs incurred, prior to the Phase 2 Election Date, pursuant to Sections VII, IX (including, but not limited to, the cost of attorney time and any monies paid to secure access and/or to secure or implement institutional controls including, but not limited to, the amount of just compensation), and XV. In addition, to the extent that the State participates in any of the activities covered by items (a)-(e) above pursuant to a Cooperative Agreement or Superfund State Contract with EPA, the costs not inconsistent with the NCP that EPA incurs, prior to the Phase 2 Election Date, under such Cooperative Agreement or Superfund State Contract are included within the meaning of Phase 1 RA Response Costs. Notwithstanding the foregoing, Phase 1 RA Response Costs do not include Past Response Costs, Non-Capped Phase 1 Costs or costs incurred by the United States in performing the Work pursuant to Paragraph 105 (Work Takeover).

"Phase 2" shall mean all parts of the Remedial Action that will be conducted after Phase 1.

"Phase 2 Election Date" shall mean the date when Settling Defendant notifies EPA, pursuant to subparagraph 15.c. of this Consent Decree, whether it will perform Phase 2 of the Remedial Action.

"Phase 2 Engineering Performance Standards" shall mean the performance standards established by EPA for dredging-related resuspension, dredging residuals and dredging productivity, including, but not limited to, the associated action levels and sampling, monitoring, contingency, record keeping and/or reporting elements of those standards, that EPA determines will apply to Phase 2 of the Remedial Action.

"Phase 2 Quality of Life Performance Standards" shall mean the performance standards established by EPA for air quality, noise, odor, lighting and navigation, including, but not limited to, the associated action levels and sampling, monitoring, contingency, record keeping and/or

reporting elements of those standards, that EPA determines will apply to Phase 2 of the Remedial Action.

"Phase 2 RA Response Costs" shall mean all direct and indirect costs, not inconsistent with the NCP, that EPA, or the U.S. Department of Justice on behalf of EPA, or ATSDR, incurs between the Phase 2 Election Date and the date of Certification of Completion of the Remedial Action pursuant to Paragraph 57, below, in connection with (a) reviewing or developing plans, reports and other items pursuant to this Consent Decree, verifying or overseeing the Work, or otherwise implementing or overseeing this Consent Decree; (b) conducting any other activities related to the Work, including but not limited to community relations activities (including the cost of maintaining EPA's Hudson River Field Office); (c) obtaining access for the Work required hereunder; (d) Institutional Controls relating to the Site; and (e) performing any other activities related to the Remedial Action. Phase 2 RA Response Costs include, but are not limited to, payroll costs, contractor costs (including annual allocation costs), interagency agreement costs, travel costs, laboratory costs, and the costs incurred, between the Phase 2 Election Date and the date of Certification of Completion of the Remedial Action, pursuant to Sections VII and IX (including, but not limited to, the cost of attorney time and any monies paid to secure access and/or to secure or implement institutional controls). In addition, to the extent that the State participates in any of the activities covered by items (a)-(e) above pursuant to a Cooperative Agreement or Superfund State Contract with EPA, the costs not inconsistent with the NCP that EPA incurs, between the Phase 2 Election Date and the date of Certification of Completion of the Remedial Action, under such Cooperative Agreement or Superfund State Contract are included within the meaning of Phase 2 RA Response Costs. Notwithstanding the foregoing, Phase 2 RA Response Costs do not include Non-Capped Phase 2 Costs or costs incurred by the United States in performing the Work pursuant to Paragraph 105 (Work Takeover).

"Plaintiff" shall mean the United States.

"Post-Phase 2 Costs" shall mean all direct and indirect costs, not inconsistent with the NCP, that EPA, or ATSDR, or the U.S. Department of Justice on behalf of EPA, incurs in connection with the following activities: (a) conducting the first two periodic reviews pursuant to Paragraph 24, below, following the date of Certification of Completion of the Remedial Action pursuant to Paragraph 57, below; and (b) overseeing Settling Defendant's performance of, or conducting any other activities with respect to, OM&M from the date of Certification of Completion of the Remedial Action until the completion of the second of the two periodic reviews referred to in item (a) immediately above.

"RA Performance Standards" shall mean the Phase 1 Engineering Performance Standards, Phase 2 Engineering Performance Standards, Phase 1 Quality of Life Performance Standards, and Phase 2 Quality of Life Performance Standards; the Remedial Action Objectives and Remediation Goals set forth in Section 9.1 of the ROD; and the Applicable or Relevant and Appropriate Requirements ("ARARs") set forth or referred to in Tables 14-1 through 14-3 of the ROD (with the exception of those ARARs that were waived in the ROD based on technical impracticability (*see* ROD Section 14.2)). RA Performance Standards also include the requirements set forth in the documents entitled "Substantive Requirements Applicable to Releases of Constituents not Subject to Performance Standards," "Substantive Requirements of State Pollutant Discharge Elimination System Permit for Potential Discharge to the Champlain

8

Canal (land cut above Lock 7)," and "Substantive Requirements of State Pollutant Discharge Elimination System Permit for Potential Discharge to the Hudson River," which EPA provided to Settling Defendant on January 7, 2005.

"RCRA" shall mean the Solid Waste Disposal Act, as amended, 42 U.S.C. §§ 6901-6992k (also known as the Resource Conservation and Recovery Act).

"RD AOC" shall mean the Administrative Order on Consent for Remedial Design and Cost Recovery, Index No. CERCLA-02-2003-2027, which EPA issued to Settling Defendant on August 13, 2003.

"Record of Decision" and "ROD" shall mean the EPA Record of Decision for the Site (including all attachments thereto) that was signed on February 1, 2002 by the Administrator of EPA and the Regional Administrator of EPA Region 2. The ROD is attached as Appendix A. Due to the large size of Part 3 of the ROD (the Responsiveness Summary), Appendix A includes an electronic copy (on CD-ROM), rather than a paper copy, of Part 3.

"Remedial Action" shall mean those activities, except for Remedial Design and Operation, Maintenance and Monitoring, to be undertaken to implement the ROD, in accordance with the SOW, the final Remedial Design plans and reports, the Remedial Action Work Plans, and other plans approved by EPA.

"Remedial Action Work Plans" and "RA Work Plans" shall mean the Remedial Action Work Plan for Phase 1 Dredging and Facility Operations (required pursuant to Section 2.3 of the SOW), the Remedial Action Work Plan for Phase 2, Year 1 Dredging and Facility Operations (required pursuant to Section 3.1 of the SOW), the Remedial Action Work Plan for Phase 2 Dredging and Facility Operations (required pursuant to Section 3.2 of the SOW), the Remedial Action Work Plan for Phase 1 Facility Site Work Construction (required pursuant to Section 2.1 of the SOW), the Remedial Action Work Plan for Phase 1 Processing Equipment Installation (required pursuant to Section 2.2 of the SOW) and the Remedial Action Work Plan for Phase 2 Facility Construction (required pursuant to Section 3.2 of the SOW), and any revisions and/or addenda thereto.

"Remedial Design" shall mean those activities undertaken to develop detailed plans and specifications for implementation of the Remedial Action.

"Remnant Deposits" shall mean the areas of PCB-contaminated sediment, designated by EPA in the ROD as Remnant Deposit Nos. 1 through 5, that are located in or adjacent to the Hudson River upstream of Rogers Island.

"Reserved OM&M Costs" shall mean all direct and indirect costs that the United States incurs, in connection with the following activities, subsequent to the time period described in the definition, above, of "Post-Phase 2 Costs": (a) conducting periodic reviews pursuant to Paragraph 24, below; and (b) overseeing Settling Defendant's performance of, or conducting any other activities with respect to, OM&M.

"Sampling AOC" shall mean Administrative Order on Consent, Index No. CERCLA-02-2002-2023, which EPA issued to Settling Defendant on July 23, 2002 with respect to the Site.

"Section" shall mean a portion of this Consent Decree identified by a Roman numeral.

"Sediment Processing/Transfer Facility(ies)" shall mean the facility(ies) at which sediments that are dredged from the Upper Hudson River in connection with the Remedial Action will be dewatered, stabilized (if needed), and then transferred to an appropriate means of transportation for either off-site disposal or beneficial use.

"Sediment Processing/Transfer Facility Property(ies)" shall mean the real properties described in Appendix D.

"Settling Defendant" shall mean General Electric Company.

"Site" shall mean the Hudson River PCBs Superfund Site located in the State of New York.

"Special Account" shall mean the Hudson River PCBs Site Special Account established by EPA within the EPA Hazardous Substances Superfund.

"State" shall mean the State of New York.

"Statement of Work" or "SOW" shall mean the statement of work for implementation of the Remedial Action and Operation, Maintenance and Monitoring at the Site, including all attachments thereto, as set forth in Appendix B to this Consent Decree, and any modifications thereto made in accordance with this Consent Decree.

"United States" shall mean the United States of America.

"Upper Hudson River" shall mean the Hudson River and Champlain Canal from the Fenimore Bridge in Hudson Falls (River Mile 197.3) to the Federal Dam at Troy (River Mile 153.9); provided that the Upper Hudson River does not include (i) the floodplain of the Hudson River or Champlain Canal, other than those parts of the Hudson River shoreline where dredging as part of the Remedial Action will be performed; (ii) the Remnant Deposits; (iii) Settling Defendant's facilities in Hudson Falls and Fort Edward, New York; (iv) any locations in the Hudson River for which NYSDEC selected a remedy in its March 2004 Record of Decision for the GE Hudson Falls Plant Site and in its January 2000 Record of Decision for the GE Fort Edward Plant Site; (v) bedrock that is in the vicinity of Outfall 004 at the GE Fort Edward facility; and (vi) any other bedrock that is in the Upper Hudson River in the vicinity of Settling Defendant's Hudson Falls and Fort Edward facilities and which is or may be a source of PCBs to the Hudson River.

"USACE" shall mean the United States Army Corps of Engineers.

"Waste Material" shall mean (1) any "hazardous substance" under Section 101(14) of CERCLA, 42 U.S.C. § 9601(14); (2) any pollutant or contaminant under Section 101(33), 42 U.S.C. § 9601(33); and (3) any "solid waste" under Section 1004(27) of RCRA, 42 U.S.C. § 6903(27).

"Work" shall mean all activities Settling Defendant is required to perform under this Consent Decree, except those required by Section XXVI (Retention of Records). The Work includes Phase 2 if Settling Defendant notifies EPA, pursuant to subparagraph 15.c., below, that Settling Defendant will implement Phase 2 pursuant to this Consent Decree.

"Work Area" shall mean any area at or near the Site where the Work will be performed, including (i) the Hudson River and Champlain Canal from the upstream end of Rogers Island at

Fort Edward downstream to the Federal Dam at Troy (or, if a Sediment Processing/Transfer Facility is located south of the Federal Dam at Troy, then downstream to the area of the Hudson River which is adjacent to that facility); (ii) the Sediment Processing/Transfer Facility Property(ies); (iii) those locations in the Hudson River and Champlain Canal where sampling or monitoring activities that are part of the Work will be performed; (iv) the shorelines immediately adjacent to those portions of the Hudson River and Champlain Canal where the Work will be performed; and (v) routes across real property that are necessary for access to perform the Work. The Work Area does not include the floodplain of the Hudson River or Champlain Canal except insofar as those areas fall within the definition given in the preceding sentence.

## V. GENERAL PROVISIONS

5.     <u>Objectives of the Parties.</u>  The objectives of the Parties in entering into this Consent Decree are to protect public health, welfare and/or the environment at the Site by the implementation of response actions at the Work Area by the Settling Defendant, to reimburse certain response costs of the Plaintiff, and to resolve the claims of Plaintiff against Settling Defendant to the extent provided in this Consent Decree.

6.     <u>Commitments by Settling Defendant</u>  Settling Defendant shall perform Phase 1 of the Remedial Action.  In addition, as provided in subparagraph 15.c., below, Settling Defendant may also perform Phase 2 of the Remedial Action.  Settling Defendant shall finance and perform the Work in accordance with this Consent Decree (including the attachments hereto), the Remedial Action Work Plans, and all other plans, standards, specifications, and schedules set forth or referenced herein or approved by EPA pursuant to this Consent Decree.  To the extent provided in this Consent Decree, Settling Defendant shall also reimburse the United States for Past Response Costs and other costs.  Work done in accordance with the SOW (including the attachments thereto), the submittals required by the SOW and approved by EPA, the Approved Design Documents, and the rest of this Consent Decree, shall be deemed to be done in accordance with the ROD; provided that this sentence does not affect any of the rights afforded to EPA elsewhere in this Consent Decree to require that changes be made to the SOW (including the attachments thereto) and/or to the Approved Design Documents. (For purposes of the preceding sentence only, the Consent Decree does not include the ROD.)

7.     <u>Compliance With Applicable Law</u>.

a.     All activities undertaken by Settling Defendant pursuant to this Consent Decree shall be performed in accordance with the requirements of all applicable federal and state laws and regulations.  Subject to subparagraph b., below, Settling Defendant must also comply with all ARARs identified in Tables 14-1 through 14-3 of the ROD which pertain to the activities undertaken by Settling Defendant pursuant to this Consent Decree, except to the extent that an ARAR was waived by EPA in the ROD (<u>see</u> Section 14.2 of the ROD).

b.     Under baseline conditions (that is, prior to the implementation of the Phase 1 and Phase 2 dredging), the federal water quality criterion of 0.014 $\mu$g/L for PCBs and the State water quality standard of 0.09 $\mu$g/L for PCBs, listed in Table 14-1 of the ROD, are sometimes exceeded in the water of the Hudson River below Rogers Island.  Based on the information known to EPA as of the date of lodging of this Consent Decree, EPA believes that the Remedial Action will lead to this water quality criterion and water quality standard being consistently met in the river water in that area.  Settling Defendant is not required by the second sentence of subparagraph 7.a.

11.   Remedial Design Plans and Reports.

a.      Notwithstanding any provision of the RD AOC, during the period between the lodging and the effective date of this Consent Decree, Settling Defendant shall provide review drafts of all deliverables under the RD AOC that relate to Phase 2 of the Remedial Action to EPA in accordance with the applicable schedule for submission of such deliverables under the RD AOC. During this period, EPA and Settling Defendant shall discuss any EPA comments and any revisions requested by EPA. If the parties agree on revisions to the deliverable in question, Settling Defendant shall make such revisions and submit a final version of the deliverable to EPA within 30 days of the date when the Parties agree on the revisions. If, during the period between the lodging and effective date of this Consent Decree, EPA and Settling Defendant do not agree on revisions to the deliverable or EPA does not approve a final version of the deliverable, then Settling Defendant shall submit that deliverable for final EPA review no later than 15 days after the effective date of this Consent Decree.

b.      Notwithstanding any provision of the RD AOC, any disputes regarding deliverables submitted by Settling Defendant to EPA pursuant to the RD AOC for which the due date for the submission falls after the effective date of this Consent Decree shall be subject to the dispute resolution procedures in Section XIX, below, rather than the dispute resolution procedures in the RD AOC.

c.      Each final Remedial Design plan and report that is submitted or finalized pursuant to the RD AOC shall be deemed incorporated into and become enforceable under this Consent Decree upon its approval by EPA and the completion of any dispute resolution regarding such document.

12.   Remedial Action.

a.      Settling Defendant shall implement Phase 1 of the Remedial Action in accordance with (1) this Consent Decree, including all attachments hereto (subject to Paragraph 6, above); (2) the Phase 1 Final Remedial Design plans and reports that have been or are approved or finalized by EPA pursuant to the RD AOC; (3) the Remedial Action Work Plans for Phase 1; and (4) all other work plans, schedules and other requirements relating to Phase 1 which are approved by EPA pursuant to this Consent Decree. The plans, reports and other requirements referred to in clauses (2), (3) and (4) of this subparagraph shall be consistent with the SOW, and the plans, reports and other requirements referred to in clauses (3) and (4) shall also be consistent with the Phase 1 Final Remedial Design plans and reports that have been or are approved or finalized by EPA pursuant to the RD AOC.

b.      If Settling Defendant notifies EPA, pursuant to subparagraph 15.c. of this Consent Decree, that it will perform Phase 2 of the Remedial Action, Settling Defendant shall implement Phase 2 in accordance with: (1) this Consent Decree, including all attachments hereto (as the SOW may be modified following the Phase 1 dredging); (2) the Phase 2 Final Remedial Design plans and reports that have been or are approved or finalized by EPA pursuant to the RD AOC, as such plans and reports may be modified (in accordance with subparagraph 15.b., below, and/or Section 3 of the SOW) following the Phase 1 dredging; (3) the Remedial Action Work Plans for Phase 2; and (4) all other work plans, schedules and other requirements relating to Phase 2 which are approved by EPA pursuant to this Consent Decree. The Phase 2 Final Remedial Design plans and reports shall be consistent with the SOW. Any revisions and/or addenda to the Phase 2 Final

14

Remedial Design plans and reports (after the EPA decision described in subparagraph 15.b) shall be consistent with the SOW as it may be modified following the Phase 1 dredging. In addition, the plans, reports and other requirements referred to in clauses (3) and (4) of this subparagraph shall be consistent with the SOW and the Phase 2 Final Remedial Design plans and reports, as the SOW and such plans and reports may be modified following the Phase 1 dredging.

c.      Settling Defendant shall submit to EPA and the State all plans, submittals, or other deliverables required under the SOW in accordance with the applicable deadlines for such submissions.

d.      Unless otherwise directed by EPA, Settling Defendant shall not commence any physical Remedial Action activities prior to EPA's approval of the work plan(s) for such work.

13.      Phase 1 Evaluation Reports

a.      Within 30 days after Settling Defendant completes one month of Phase 1 dredging at the estimated full production rate for Phase 2, Settling Defendant shall provide to EPA a Phase 1 Data Compilation which compiles all the data collected during Phase 1 up to and including that date and that are relevant to the issues identified in subparagraph 14.b., below, and any other topics that EPA has agreed should be included in the charge to the Peer Review Panel.

b.      Within 60 days after Settling Defendant completes one month of Phase 1 dredging operations at the estimated full production rate for Phase 2, EPA and Settling Defendant will each finalize a complete draft of its Phase 1 Evaluation Report (individually, "EPA Phase 1 Evaluation Report" and "GE Phase 1 Evaluation Report") and provide such draft report to the other Party in electronic form. Each Phase 1 Evaluation Report will include an evaluation of the Phase 1 dredging operations with respect to the Phase 1 Engineering Performance Standards; set forth proposed changes to the Phase 1 Engineering Performance Standards if appropriate; and in general, evaluate the experience gained from the Phase 1 dredging operations insofar as such information is relevant to the issues identified in subparagraph 14.b. and any other issues that EPA has agreed should be encompassed in its charge to the Peer Review panel.

c.      The Parties shall have 14 days (or a longer period, if agreed to by the Parties) after receipt of the draft Phase 1 Evaluation Reports to provide written comments to each other on those reports. The Parties shall have 10 days following receipt of such comments to have discussions regarding the content, findings and conclusions of the draft Phase 1 Evaluation Reports. EPA and Settling Defendant will incorporate into the Phase 1 Evaluation Reports those changes and/or additions on which EPA and Settling Defendant have reached agreement, if any.

14.      Peer Review

a.      The Peer Review will evaluate the Phase 1 Evaluation Reports. The Peer Review will be conducted in accordance with EPA's Science Policy Council Handbook: Peer Review (December 2000), or any applicable updates thereto; the Office of Management and Budget's *Final Information Quality Bulletin for Peer Review* (December 16, 2004), or any applicable updates thereto; and the provisions of this Paragraph.

b.    The Peer Review panel shall, at a minimum, address the issues raised by the following questions:

(1)    Does the experience in Phase 1 show that each of the Phase 1 Engineering Performance Standards can consistently be met individually and simultaneously?

(2)    If not, and if EPA and/or Settling Defendant has proposed modified Engineering Performance Standards, does the experience in Phase 1 and any other evidence before the panel show that it will be practicable to consistently and simultaneously meet the Engineering Performance Standards that are being proposed for Phase 2?

(3)    If the experience in Phase 1 and other evidence before the panel does not show that it will be practicable to consistently and simultaneously meet the Engineering Performance Standards that are being proposed for Phase 2, can the Phase 1 Engineering Performance Standards be modified so that they could consistently be met in Phase 2, and, if so, how?

(4)    If EPA and/or Settling Defendant has proposed modifications to the monitoring and sampling program for Phase 2, are the proposed modifications adequate and practicable for determining whether the Phase 2 Engineering Performance Standards will be met?

c.    The members of the Peer Review panel shall be selected by a neutral person ("the Peer Review Selector") chosen by agreement between EPA and Settling Defendant. If EPA and Settling Defendant cannot agree on a Peer Review Selector within 21 days of the lodging of this Consent Decree, then EPA will choose the Peer Review Selector. In selecting member(s) for the Peer Review panel, the Peer Review Selector shall select persons who have expertise relevant to the nature and scope of the review to be undertaken and shall endeavor to ensure that all relevant areas of expertise are represented on the panel. Panel members shall be impartial, and must not have a conflict of interest. Prior to the Peer Review Selector's selection of Peer Review panel members, both EPA and Settling Defendant will have an opportunity to identify to the Peer Review Selector the appropriate areas of expertise of Peer Review panel members and to recommend to the Peer Review Selector potential members for the panel. The members of the Peer Review panel that reviewed EPA's October 2003 draft Engineering Performance Standards shall be considered for membership on the Peer Review panel. In addition, the Peer Review Selector shall consider for selection such persons as are recommended by EPA or Settling Defendant. Neither EPA nor Settling Defendant shall have *ex parte* communications with the members of the Peer Review panel. Following selection of the panel members, EPA's Peer Review Contractor (a separate entity from the Peer Review Selector) shall manage the conduct of the peer review.

d.    The Peer Review panel will not evaluate whether the Remedial Action will, or may, achieve the human health and/or environmental objectives of the ROD, nor will the Peer Review panel evaluate whether Phase 2 should be implemented.

e.      EPA will provide Settling Defendant an opportunity to submit proposed charge questions to EPA prior to EPA's finalization of the charge to the Peer Review panel. EPA also will provide Settling Defendant with an opportunity to review and comment to EPA on EPA's draft charge questions prior to their finalization. EPA will prepare the final charge questions for the Peer Review panel. The charge shall include, at a minimum, questions that are in substantially the same form as the questions identified in subparagraph 14.b., above.

f.      EPA will release the Phase 1 Evaluation Reports to the public, and the Peer Review Contractor will release the Phase 1 Evaluation Reports to the Peer Review panel. EPA will accept public comments on the Phase 1 Evaluation Reports for a period of not less than 30 days. EPA will compile public comments received on the Phase 1 Evaluation Reports and the Peer Review Contractor will make such comments (along with any written response that EPA and/or Settling Defendant chooses to provide to such comments) available to the Peer Review panel during the period of its review. When making such public comments available to the Peer Review panel, the Peer Review Contractor will ensure that Settling Defendant's comments, if any, are clearly identified.

g.      The members of the Peer Review panel shall be provided a reasonable and adequate time to conduct the Peer Review.

h.      EPA will provide Settling Defendant and the public with an opportunity to express their views orally to the Peer Review panel on the issues in the charge questions. At a minimum:

(1)      If the Peer Review Contractor holds an introductory meeting for the Peer Review panel, then Settling Defendant will be given two hours at such meeting to present a review and summary of the Phase 1 data and of Settling Defendant's experience during Phase 1 insofar as such information is relevant to the charge questions; provided , however, that if EPA makes a presentation to the Peer Review panel at the introductory meeting and such presentation lasts longer than two hours, then Settling Defendant shall be given the same amount of time as EPA to present to the panel, up to a maximum of four hours for Settling Defendant's presentation.

(2)      In lieu of holding an introductory meeting for the Peer Review panel, the Peer Review Contractor may initiate the Peer Review panel's review by transmitting to the panel members, by mail or electronic mail, the Phase 1 Evaluation Reports and the charge. If the Peer Review Contractor plans to do so, then EPA will give Settling Defendant an opportunity to provide the Peer Review Contractor with written or electronic presentation materials that the Peer Review Contractor will forward to the Peer Review panel members. If Settling Defendant elects to prepare such materials, it must submit such materials to EPA and the Peer Review Contractor no later than 25 days after the later of (i) the date that EPA transmits the draft charge to Settling Defendant, or (ii) the date on which EPA and Settling Defendant exchange draft Phase 1 Evaluation Reports. The Peer Review

Contractor will transmit Settling Defendant's presentation materials, if any, to the Peer Review panel when the Peer Review Contractor forwards the Phase 1 Evaluation Reports and the charge to the Peer Review panel. Any such presentation materials that Settling Defendant submits to the Peer Review Contractor may only be concerned with topics identified in subparagraph 14.b., above, and any other topics that EPA has agreed should be encompassed in its charge to the Peer Review.

(3)     When the Peer Review panel is deliberating in public, the Peer Review Contractor shall inform the panel that it is free to request clarification from EPA with respect to the EPA Phase 1 Evaluation Report or the charge, from Settling Defendant with respect to the GE Phase 1 Evaluation Report and from EPA and Settling Defendant regarding information contained in and issues raised by their respective presentations to the panel under subsections (1) and (2), above, that are germane to the issues raised by the charge.

(4)     On the initial day of the Peer Review panel's public deliberations, Settling Defendant will be given at least two hours to present its views on the charge questions to the Peer Review panel.

(5)     On the final day of the Peer Review panel's public deliberations, prior to the panel's presentation of its final recommendations with respect to the charge questions, Settling Defendant will be given at least one hour to present its views on the charge questions to the Peer Review panel.

i.     All monitoring and other data and information collected during the Phase 1 dredging with respect to the Phase 1 Engineering Performance Standards will be available to the Peer Review panel through the Peer Review Contractor.

j.     After the Peer Review, the Peer Review Contractor will issue a report (the "Peer Review Report") that will state the Peer Review panel members' conclusions and recommendations with respect to the charge questions. Such report shall be released simultaneously to EPA, Settling Defendant and to the public, and EPA's response, if any, to such report, will also be made available to the public.

15.     Phase 2

a.     Following the Phase 1 dredging, EPA will provide Settling Defendant with an opportunity to discuss with EPA the changes that EPA believes are appropriate, if any, to the Phase 1 Engineering Performance Standards, the Phase 1 Quality of Life Performance Standards, the SOW, and/or the scope of Phase 2, before EPA makes a decision regarding such changes.

b.     After providing Settling Defendant with an opportunity for discussion in accordance with the preceding subparagraph, and after the Peer Review, EPA will notify Settling Defendant, in writing, of EPA's decision regarding changes, if any, to the Phase 1 Engineering Performance Standards, the Phase 1 Quality of Life Performance Standards, the SOW, and the

18

scope of Phase 2.  Within thirty (30) days of Settling Defendant's receipt of such notification or within such other time as agreed to by the Parties, Settling Defendant shall submit to EPA, for review and approval, the documents required by Section 3.1.1.1 of the SOW.

       c.     No later than August 1, 2008, Settling Defendant shall provide written notice to EPA and the State stating unequivocally whether Settling Defendant will implement, pursuant to this Consent Decree, Phase 2 of the Remedial Action; provided, however, that if EPA does not provide Settling Defendant by June 1, 2008  with written notification of EPA's decision regarding changes, if any, to the Phase 1 Engineering Performance Standards, the Phase 1 Quality of Life Performance Standards, the SOW, and the scope of Phase 2, Settling Defendant shall have until 90 days after its receipt of such written notification to notify EPA and the State, unequivocally and in writing, as to whether Settling Defendant will implement, pursuant to this Consent Decree, Phase 2 of the Remedial Action.  If Settling Defendant notifies EPA that it will implement Phase 2 under this Consent Decree, then Settling Defendant shall proceed to implement and complete that work, in accordance with the SOW and the other requirements of this Consent Decree.  Settling Defendant may not invoke the dispute resolution procedures of Section XIX, below, with respect to whether EPA's notification pursuant to subparagraph 15.b., above, is sufficient to trigger (i) the period for Settling Defendant to provide the notification required by this subparagraph c., or (ii) Settling Defendant's obligation to submit the documents pursuant to subparagraph 15.b., above.

      16.     To help ensure that there is no delay in the transition between Phase 1 and Phase 2 of the Remedial Action, Settling Defendant agrees to undertake those activities necessary to efficiently prepare for the remobilization of contractors and equipment that will be needed to undertake Phase 2 of the Remedial Action; provided, however, that Settling Defendant shall not be required to expend more than $5,000,000 on such activities during the period between the completion of Phase 1 dredging and Settling Defendant's notification pursuant to subparagraph 15.c., above.  The costs of maintaining or owning plant and equipment purchased for Phase 1 shall not be included in computing the $5,000,000 figure.  In addition, the $5,000,000 limit shall not include the costs of Settling Defendant's obligations, under other provisions of this Consent Decree, with respect to the performance of Phase 1. Further, if Settling Defendant notifies EPA pursuant to subparagraph 15.c., above, that Settling Defendant will not perform Phase 2, Settling Defendant shall continue conducting water column monitoring pursuant to the Remedial Action Monitoring Plan for three months following such notification, and shall also, in the year following Phase 1, perform the fish monitoring required by the Remedial Action Monitoring Plan. Each of Settling Defendant's monthly progress reports submitted pursuant to Paragraph 39, below, that covers a month which falls, in whole or in part, within the period from the completion of Phase 1 dredging through Settling Defendant's notification pursuant to subparagraph 15.c., above, shall specify the activities that Settling Defendant performed during such month, or plans to perform during the next two months, in order to prepare for remobilization of contractors and equipment needed to undertake Phase 2, and the cost of such activities. Within 14 days of EPA's request therefor, Settling Defendant shall also provide EPA with copies of invoices, proof of payment, and other appropriate documentation of these expenditures.

an event, Settling Defendant shall submit a report setting forth all actions taken in response thereto.

43.     Settling Defendant shall submit all plans, reports, and data required by this Consent Decree, the SOW, the Remedial Action Work Plans, or any other plans approved pursuant to this Consent Decree, to EPA in accordance with the schedules set forth in this Consent Decree, the SOW and in such approved plans.

44.     All reports and other documents submitted by Settling Defendant to EPA (other than the monthly progress reports referred to above) which purport to document Settling Defendant's compliance with the terms of this Consent Decree shall be signed by an authorized representative of the Settling Defendant.

## XI. EPA APPROVAL OF PLANS AND OTHER SUBMISSIONS

45.     After review of any plan, report or other item which is required to be submitted for approval pursuant to this Consent Decree, EPA, after a reasonable opportunity for review and comment by the State, shall: (a) approve, in whole or in part, the submission; (b) approve the submission upon specified conditions; (c) modify the submission to cure the deficiencies; (d) disapprove, in whole or in part, the submission, directing that the Settling Defendant modify the submission; or (e) any combination of the above; provided that any such modifications or directions would not materially expand the scope of the Work required pursuant to this Consent Decree, subject to the provisions of Paragraph 20, above. However, EPA shall not modify a submission without first providing Settling Defendant with at least one notice of deficiency and an opportunity to cure within 21 days (or such longer time as is allowed by EPA), except where to do so would cause serious disruption to the Work or where previous submission(s) have been disapproved due to material defects and the deficiencies in the submission under consideration indicate a bad faith lack of effort to submit an acceptable deliverable. Where EPA disapproves a submission due to a material defect, EPA's notification of disapproval will be sufficiently clear so that the changes needed to cure the defect can be understood.

46.     In the event of approval, approval upon conditions, or modification by EPA, pursuant to subparagraphs 45(a), (b), or (c), Settling Defendant shall proceed to take any action required by the plan, report, or other item, as approved or modified by EPA subject only to its right to invoke the Dispute Resolution procedures set forth in Section XIX (Dispute Resolution) with respect to the modifications or conditions made by EPA. In the event that EPA modifies the submission to cure the deficiencies pursuant to subparagraph 45(c) and the submission has a material defect, EPA retains its right to seek stipulated penalties, as provided in Section XX (Stipulated Penalties).

47.     Resubmission of Plans.

a.     Upon receipt of a notice of disapproval pursuant to subparagraph 45(d), Settling Defendant shall, within 21 days or such longer time as specified by EPA in such notice, correct the deficiencies and resubmit the plan, report, or other item for approval. Any stipulated penalties applicable to the submission, as provided in Section XX, shall accrue during the 21-day

below, to dispute an EPA determination under this Paragraph that Settling Defendant's financial assurances provided pursuant to this Section are inadequate. Settling Defendant's inability to demonstrate financial ability to complete the Work shall not excuse performance of any activities required under this Consent Decree.

54.    If Settling Defendant can show that the estimated cost to complete the remaining Work has diminished below the amounts established pursuant to Paragraph 51 or Paragraph 52 (if applicable) above after entry of this Consent Decree, Settling Defendant may, on any anniversary date of entry of this Consent Decree, or at any other time agreed to by the Parties, reduce the amount of the financial security provided under this Section to the estimated cost of the remaining work to be performed. Settling Defendant shall submit a proposal for such reduction to EPA, in accordance with the requirements of this Section, and may reduce the amount of the security upon approval by EPA. In the event of a dispute, Settling Defendant may reduce the amount of the security in accordance with the final administrative or judicial decision resolving the dispute.

55.    Settling Defendant may change the form of financial assurance provided under this Section at any time, upon notice to and approval by EPA, provided that the new form of assurance meets the requirements of this Section. In the event of a dispute, Settling Defendant may change the form of the financial assurance only in accordance with the final administrative or judicial decision resolving the dispute.

XIV. CERTIFICATION OF COMPLETION

56.    Completion of Construction of Phase 1

a.    Within seven days after Settling Defendant makes the preliminary determination that all Phase 1 Field Activities have been completed, Settling Defendant shall schedule with EPA and the State a Pre-Final Phase 1 Construction Completion Inspection. For purposes of this Consent Decree, "Phase 1 Field Activities" means the dredging activities that occur during the first construction season of remedial dredging at the Work Area; the backfilling or capping (as appropriate) of the areas dredged during that season; the stabilization of shorelines in those areas; the processing and off-site shipment of all sediments removed during that season; the installation of habitat replacement/reconstruction measures (where required) in the areas dredged during that season; and the monitoring, pursuant to the Remedial Action Monitoring Plan, conducted during the period of the aforementioned activities; but it does not include preparation of the Phase 1 Evaluation Reports, the Peer Review, or OM&M of the Phase 1 areas. For purposes of this Section XIV, "installation of habitat replacement/reconstruction measures" means the initial installation of active habitat replacement/reconstruction measures in the areas dredged during Phase 1 (including such measures that may initially be installed during the spring in the year immediately following the construction season in which Phase 1 dredging is performed), but does not include OM&M or adaptive management of the habitat replacement/reconstruction. The Pre-Final Phase 1 Construction Completion Inspection shall consist of a walk-through inspection of all on-land properties within the Work Area at which Phase 1 Field Activities were conducted, and an on-river inspection of the Phase 1 dredge areas. The purpose of the inspection is to help determine whether the Phase 1 Field Activities were completed in accordance with this Consent Decree.

b.     If, after the Pre-Final Phase 1 Construction Completion Inspection, Settling Defendant still believes that the Phase 1 Field Activities are complete, then within 30 days of the inspection Settling Defendant shall submit to EPA, for review and approval, a Phase 1 Construction Report by a registered professional engineer licensed in New York State.  The report shall include a summary of all information demonstrating the proper completion of the Phase 1 Field Activities and shall request EPA's Certification of Completion of Phase 1 Field Activities. The report shall state that the Phase 1 Field Activities were completed in full satisfaction of the requirements of the Consent Decree, and shall contain the following statement, signed by a responsible corporate official of Settling Defendant or the Settling Defendant's Project Coordinator:

> I certify under penalty of law that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted.  Based on my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering the information, the information contained in or accompanying this submission is, to the best of my knowledge and belief, true, accurate, and complete.  I am aware that there are significant penalties for submitting false information, including the possibility of fines and imprisonment for knowing violations.

c.     If, after completion of the Pre-Final Phase 1 Construction Completion Inspection, or receipt and review of the Phase 1 Construction Report, EPA, after a reasonable opportunity for review and comment by the State and by the Federal Trustees for Natural Resources, determines that any of the Phase 1 Field Activities have not been completed in accordance with this Consent Decree, EPA will notify Settling Defendant in writing of the activities that must be undertaken by Settling Defendant pursuant to this Consent Decree to complete the Phase 1 Field Activities, provided, however, that

(1)     EPA may only require Settling Defendant to perform such activities pursuant to this Paragraph to the extent that such activities are consistent with, and would not materially expand, the scope of the remedy selected in the ROD or the scope of the work required by the SOW, the Approved Design Documents for Phase 1, or the Phase 1 Remedial Action Work Plan (provided that this item (1) does not affect any of the rights afforded to EPA elsewhere in this Consent Decree to require that changes be made to the SOW, the Approved Design Documents for Phase 1, or the Phase 1 Remedial Action Work Plan);

(2)     Settling Defendant shall not be required by EPA's notification under this Paragraph to perform (i) dredging activities in any Certification Unit ("CU") (or portion thereof) for which EPA has issued, pursuant to Section 5.2 of the SOW, a CU Dredging Completion Approval, (ii) backfilling or capping activities in any CU (or portion thereof) for which EPA has issued a CU Backfill/Engineered Cap Completion Approval, or (iii) any additional remedial construction activities (including installation of habitat replacement/reconstruction measures) in any CU for which EPA has

issued a Final CU Construction Completion Certification; provided that EPA's issuance of any such approval or certification shall not relieve Settling Defendant of its obligations under this Consent Decree to perform operation, monitoring, maintenance and adaptive management activities at such Certification Unit, and further provided that nothing in this item (2) shall affect the reservations of rights at Paragraph 100 (United States' Pre-Certification Reservations), Paragraph 101 (United States' Post-Certification Reservations), or Paragraph 104 (General Reservations of Rights); and

(3)     Settling Defendant shall not be required under this Consent Decree to perform Phase 2 of the Remedial Action unless Settling Defendant notifies EPA, pursuant to subparagraph 15.c., above, that Settling Defendant will implement Phase 2 pursuant to this Consent Decree.

If EPA notifies Settling Defendant under this Paragraph that activities must be undertaken to complete the Phase 1 Field Activities, then EPA will set forth in such notice a schedule for performance of such activities consistent with the Consent Decree and the SOW or require Settling Defendant to submit such a schedule to EPA for review and approval.  Settling Defendant shall perform all activities described in the notice in accordance with the specifications and schedules established therein, subject to its right to invoke the dispute resolution procedures set forth in Section XIX (Dispute Resolution).  Within 15 days after completion of all such activities, Settling Defendant shall schedule with EPA and the State a Final Phase 1 Construction Completion Inspection of the locations where such activities were conducted.  Such inspection shall be followed by further reporting or other activities, as determined appropriate by EPA, consistent with this subparagraph and subparagraph 56.b., above.

d.     If EPA concludes, based on the initial or any subsequent Phase 1 Construction Report and after a reasonable opportunity for review and comment by the State and by the Federal Trustees for Natural Resources, that the Phase 1 Field Activities have been completed in accordance with this Consent Decree, EPA will so certify in writing to Settling Defendant.  This certification shall constitute the Certification of Completion of Phase 1 Field Activities for purposes of this Consent Decree including, but not limited to, Section XXI (Covenants Not to Sue by Plaintiff).  This certification shall not affect Settling Defendant's remaining obligations under this Consent Decree.

e.     EPA will endeavor to respond to Settling Defendant's request for a Certification of Completion of Phase 1 Field Activities within 180 days of EPA's receipt of such request, and in any event, will respond to such request no later than 365 days after EPA's receipt of the request.

57.     Completion of the Remedial Action.  If Settling Defendant notifies EPA, pursuant to subparagraph 15.c., above, that it will implement Phase 2 of the Remedial Action, then Settling Defendant shall comply with subparagraphs a. through c., below:

a.      Within 15 days after Settling Defendant makes the preliminary determination that the Remedial Action is complete, Settling Defendant shall schedule with EPA and the State an RA Completion Pre-Final Inspection.  The RA Completion Pre-Final Inspection shall consist of a walk-through inspection of all on-land properties at which sediment processing/transfer operations, habitat restoration, and other remedial activities were conducted, and an on-river inspection of the dredge areas.  The purpose of the inspection is to help determine whether the Remedial Action has been completed in accordance with this Consent Decree.

b.      If, after the RA Completion Pre-Final Inspection, Settling Defendant still believes that the Remedial Action is complete, then within 90 days of the inspection, Settling Defendant shall submit to EPA, for review and approval, a Remedial Action Report by a registered professional engineer licensed in New York State.  The report shall request EPA's Certification of Completion of the Remedial Action, and shall include a summary of all information demonstrating the proper completion of the Remedial Action. The report shall state that the Remedial Action has been completed in full satisfaction of the requirements of the Consent Decree, and shall contain the following statement, signed by a responsible corporate official of Settling Defendant or the Settling Defendant's Project Coordinator:

> I certify under penalty of law that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted.  Based on my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering the information, the information contained in or accompanying this submission is, to the best of my knowledge and belief, true, accurate, and complete.  I am aware that there are significant penalties for submitting false information, including the possibility of fines and imprisonment for knowing violations.

c.      If, after completion of the RA Completion Pre-Final Inspection, or receipt and review of the Remedial Action Report, EPA, after a reasonable opportunity for review and comment by the State and the Federal Trustees for Natural Resources, determines that any portion of the Remedial Action has not been completed in accordance with this Consent Decree, EPA will notify Settling Defendant in writing of the activities that must be undertaken by Settling Defendant pursuant to this Consent Decree to complete the Remedial Action, provided, however, that

(1)      EPA may only require Settling Defendant to perform such activities pursuant to this Paragraph to the extent that such activities are consistent with, and would not materially expand, the scope of the remedy selected in the ROD or the scope of the work required by the SOW (as the SOW may be modified following the Phase 1 dredging), the Approved Design Documents (as such documents may be modified following the Phase 1 dredging), or the Remedial Action Work Plans (provided that this item (1) does not affect any of the rights afforded to EPA elsewhere in this Consent Decree to require that changes be made to the Remedial Action,  the SOW,

the Approved Design Documents, or the Remedial Action Work Plans); and

(2)    Settling Defendant shall not be required by EPA's notification under this Paragraph to perform (i) dredging activities in any CU (or portion thereof) for which EPA has issued, pursuant to Section 5.2 of the SOW, a CU Dredging Completion Approval, (ii) backfilling or capping activities in any CU (or portion thereof) for which EPA has issued a CU Backfill/Engineered Cap Completion Approval, or (iii) any additional remedial construction activities (including installation of habitat replacement/reconstruction measures) in any CU for which EPA has issued a Final CU Construction Completion Certification; provided that EPA's issuance of any such approval or certification shall not relieve Settling Defendant of its obligations under this Consent Decree to perform operation, monitoring, maintenance and adaptive management activities at such Certification Unit, and further provided that nothing in this item (2) shall affect the reservations of rights at Paragraph 100 (United States' Pre-Certification Reservations), Paragraph 101 (United States' Post-Certification Reservations), or Paragraph 104 (General Reservations of Rights).

If EPA notifies Settling Defendant under this Paragraph that activities must be undertaken to complete the Remedial Action, then EPA will set forth in such notice a schedule for performance of such activities consistent with the Consent Decree and the SOW or require the Settling Defendant to submit such a schedule to EPA for review and approval.  Settling Defendant shall perform all activities described in the notice in accordance with the specifications and schedules established therein, subject to its right to invoke the dispute resolution procedures set forth in Section XIX (Dispute Resolution).  Within 15 days after completion of all such activities, Settling Defendant shall schedule with EPA and the State an RA Completion Final Inspection of the locations where such activities were conducted.  Such inspection shall be followed by further reporting or other activities, as determined appropriate by EPA, consistent with this subparagraph and subparagraph 57.b., above.

    d.    If EPA concludes, based on the initial or any subsequent report requesting Certification of Completion of the Remedial Action and after a reasonable opportunity for review and comment by the State and by the Federal Trustees for Natural Resources, that the Remedial Action has been performed in accordance with this Consent Decree, EPA will so certify in writing to Settling Defendant.  This certification shall constitute the Certification of Completion of the Remedial Action for purposes of this Consent Decree including, but not limited to, Section XXI (Covenants Not to Sue by Plaintiff).  Certification of Completion of the Remedial Action shall not affect Settling Defendant's remaining obligations under this Consent Decree.

    e.    EPA will endeavor to respond to Settling Defendant's request for a Certification of Completion of the Remedial Action within 180 days of EPA's receipt of such request, and in any event, will respond to such request no later than 365 days after EPA's receipt of the request.

XXI. Covenants Not to Sue by Plaintiff

98.    In consideration of the actions that will be performed and the payments that will be made by the Settling Defendant under the terms of the Consent Decree, and except as specifically provided in Paragraphs 100, 101, and 104, below, the United States covenants not to sue or to take administrative action against Settling Defendant pursuant to Sections 106 and/or 107(a) of CERCLA and/or Section 7003 of RCRA (and EPA and USACE covenant not to sue or to take administrative action against Settling Defendant under any other statute or legal authority pursuant to which EPA or USACE could obtain relief comparable to that which could be obtained under Sections 106 and/or 107(a) of CERCLA and/or Section 7003 of RCRA):

a.    for performance of the Work;

b.    for recovery of Past Response Costs, Phase 1 RA Response Costs and Non-Capped Phase 1 Costs and, if Settling Defendant notifies EPA, pursuant to subparagraph 15.c., above, that it will implement Phase 2 pursuant to this Consent Decree, for recovery of Phase 2 RA Response Costs, Non-Capped Phase 2 Costs, and Post-Phase 2 Costs;

c.    for the performance of, or payment for, additional response actions in connection with the specific locations in the Upper Hudson River that are dredged in Phase 1 of the Remedial Action;

d.    to require Settling Defendant to perform any dredging or construction for Phase 2 of the Remedial Action (other than any such activities required elsewhere in this Consent Decree) during the period up to and including the earlier of (i) the date which is the applicable deadline under subparagraph 15.c., above, for Settling Defendant to notify EPA as to whether Settling Defendant will implement Phase 2 pursuant to this Consent Decree, and (ii) the date when Settling Defendant actually provides that notification to EPA;

e.    for administrative or judicial injunctive-type relief or reimbursement of response costs with respect to the Existing Contamination, if any, at the Sediment Processing/Transfer Facility Property(ies);

f.    for administrative or judicial injunctive-type relief with respect to PCB contamination in the Upper Hudson River, or for reimbursement of response costs in connection with the Upper Hudson River, if Settling Defendant notifies EPA, pursuant to subparagraph 15.c., above, that Settling Defendant will implement Phase 2 pursuant to this Consent Decree;

g.    for recovery of costs paid by Settling Defendant to HRI pursuant to subparagraph 72.a., above, and for any costs that are incurred by EPA during Phase 1 with respect to improving communication and public understanding of fish advisories related to PCBs in the Hudson River, including investigating why some anglers/consumers do not follow those fish advisories; posting advisory signs; and communicating information to the public regarding those advisories; and

h.    if Settling Defendant notifies EPA, pursuant to subparagraph 15.c., above, that it will implement Phase 2 pursuant to the Consent Decree, for recovery of costs paid by Settling Defendant to HRI pursuant to subparagraph 72.b., above, and for any costs that are incurred by EPA with respect to improving communication and public understanding of fish advisories

related to PCBs in the Hudson River, including investigating why some anglers/consumers do not follow those fish advisories; posting advisory signs; and communicating information to the public regarding those advisories.

99.    Timing of Covenants.  Except with respect to future liability as set forth in subparagraphs 99.a. and 99.b., below, and except with respect to Fish Consumption Advisories and Fishing Restrictions as set forth in subparagraphs 99.c. and 99.d., below, these covenants not to sue shall take effect upon the later of (i) the effective date of this Consent Decree, and (ii) receipt by EPA of the payment required by Paragraph 61 of Section XVI (Payments for Response Costs).

a.    With respect to future liability relating to Phase 1 of the Remedial Action, the covenant not to sue in subparagraph 98.c. shall take effect upon EPA's Certification of Completion of Phase 1 Field Activities pursuant to Paragraph 56 of Section XIV (Certification of Completion).

b.    With respect to future liability relating to Phase 2 of the Remedial Action and the Upper Hudson River, the covenant not to sue in subparagraph 98.f. shall take effect upon EPA's Certification of Completion of the Remedial Action pursuant to Paragraph 57 of Section XIV (Certification of Completion).

c.    The covenant not to sue set forth in subparagraph 98.g., above, shall take effect upon receipt by HRI of the payment required by subparagraph 72.a., above.

d.    The covenant not to sue set forth in subparagraph 98.h, above, shall take effect upon receipt by HRI of the payment pursuant to subparagraph 72.b, above.

e.    These covenants not to sue are conditioned upon the satisfactory performance by Settling Defendant of its obligations under this Consent Decree.  These covenants not to sue extend only to the Settling Defendant and do not extend to any other person.

100.    United States' Pre-Certification Reservations.

a.    Notwithstanding any other provision of this Consent Decree, the United States reserves, and this Consent Decree is without prejudice to, the right to institute proceedings in this action or in a new action, or to issue an administrative order, seeking to compel Settling Defendant to perform further response actions in connection with the specific locations in the Upper Hudson River that are dredged in Phase 1 of the Remedial Action, or to reimburse the United States for additional costs of response relating to such areas, if, prior to the Certification of Completion of Phase 1 Field Activities:

(1)    conditions in such areas, previously unknown to EPA, are discovered, or information, previously unknown to EPA, is received, in whole or part; and

(2)    EPA determines that these previously unknown conditions or information, together with any other relevant information, indicates that the Work

undertaken or to be undertaken in those areas is not protective of human health or the environment;

provided that such further response actions address or respond to EPA's determination that the Work undertaken or to be undertaken in such areas is not protective of human health or the environment.

b.　　Notwithstanding any other provision of this Consent Decree, if Settling Defendant notifies EPA pursuant to subparagraph 15.c., above, that it will perform Phase 2 of the Remedial Action, the United States reserves, and this Consent Decree is without prejudice to, the right to institute proceedings in this action or in a new action, or to issue an administrative order, seeking to compel Settling Defendant to perform further response actions relating to the Upper Hudson River, or to reimburse the United States for additional costs of response relating to the Upper Hudson River, if, prior to the Certification of Completion of the Remedial Action:

(1)　　conditions at the Upper Hudson River, previously unknown to EPA, are discovered, or information, previously unknown to EPA, is received, in whole or part; and

(2)　　EPA determines that these previously unknown conditions or information together with any other relevant information indicates that the Remedial Action is not protective of human health or the environment;

provided that such further response actions address or respond to EPA's determination that the Remedial Action is not protective of human health or the environment.

101.　　United States' Post-Certification Reservations.

a.　　Notwithstanding any other provision of this Consent Decree, the United States reserves, and this Consent Decree is without prejudice to, the right to institute proceedings in this action or in a new action, or to issue an administrative order, seeking to compel Settling Defendant to perform further response actions in connection with the specific locations in the Upper Hudson River that are dredged in Phase 1 of the Remedial Action, or to reimburse the United States for additional costs of response relating to such areas, if, subsequent to the Certification of Completion of Phase 1 Field Activities:

(1)　　conditions in such areas, previously unknown to EPA, are discovered, or information, previously unknown to EPA, is received, in whole or part; and

(2)　　EPA determines that these previously unknown conditions or information, together with any other relevant information, indicates that the Work undertaken or to be undertaken in such areas is not protective of human health or the environment;

provided that such further response actions address or respond to EPA's determination that the Work undertaken or to be undertaken in such areas is not protective of human health or the environment.

b.      Notwithstanding any other provision of this Consent Decree, if Settling Defendant notifies EPA pursuant to subparagraph 15.c, above, that it will perform Phase 2 of the Remedial Action, the United States reserves, and this Consent Decree is without prejudice to, the right to institute proceedings in this action or in a new action, or to issue an administrative order, seeking to compel Settling Defendant to perform further response actions relating to the Upper Hudson River, or to reimburse the United States for additional costs of response relating to the Upper Hudson River, if, subsequent to the Certification of Completion of the Remedial Action:

> (1)    conditions at the Upper Hudson River, previously unknown to EPA, are discovered, or information, previously unknown to EPA, is received; and

> (2)    EPA determines that these previously unknown conditions or information together with any other relevant information indicates that the Remedial Action is not protective of human health or the environment;

provided that such further response actions address or respond to EPA's determination that the Remedial Action is not protective of human health or the environment.

102.    a.      For purposes of Paragraph 100, the information and the conditions known to EPA shall include that information and those conditions known to EPA as of the date of lodging of this Consent Decree and set forth in the Record of Decision, the administrative record supporting the Record of Decision, the documents issued by EPA with respect to the Site between the issuance of the ROD and the date of lodging of this Consent Decree, any information received by EPA pursuant to the requirements of the Sampling AOC or RD AOC prior to the date of lodging of this Consent Decree, any data regarding PCB levels in the water column, sediments, or fish at the Site generated by EPA or that EPA received from any person prior to the date of lodging of this Consent Decree, and any data or information submitted by Settling Defendant to EPA Region 2, in writing, with respect to the Site prior to the date of lodging of this Consent Decree.

b.      For purposes of subparagraph 101.a., the information and the conditions known to EPA shall include only that information and those conditions identified in subparagraph 102.a., above, and that information and those conditions known to EPA as of the date of Certification of Completion of Phase 1 Field Activities and set forth in the post-ROD administrative record, the documents issued by EPA with respect to the Site between the issuance of the ROD and the date of Certification of Completion of Phase 1 Field Activities, any information received by EPA pursuant to the requirements of the Sampling AOC, RD AOC or this Consent Decree prior to Certification of Completion of Phase 1 Field Activities, and any data regarding PCB levels in the water column, sediments, or fish at the Site generated by EPA or that EPA received from any person prior to the date of the Certification of Completion of Phase 1 Field Activities.

      c.      For purposes of subparagraph 101.b., the information and the conditions known to EPA shall include only that information and those conditions identified in subparagraphs 102.a. and 102.b., above, and that information and those conditions known to EPA as of the date of Certification of Completion of the Remedial Action and set forth in the post-ROD administrative record, the documents issued by EPA with respect to the Site between the issuance of the ROD and the date of Certification of Completion of the Remedial Action, any information received by EPA pursuant to the requirements of the Sampling AOC, RD AOC or this Consent Decree prior to Certification of Completion of the Remedial Action, and any data regarding PCB levels in water column, sediments, or fish at the Site generated by EPA or that EPA received from any person prior to the date of the Certification of Completion of the Remedial Action.

103.    With respect to any claim or cause of action asserted by the United States against Settling Defendant with respect to the Sediment Processing/Transfer Facility Property(ies), Settling Defendant shall bear the burden of proving that the claim or cause of action, or any part thereof, is attributable solely to Existing Contamination.

104.    <u>General Reservations of Rights.</u>  The United States reserves, and this Consent Decree is without prejudice to, all rights against Settling Defendant with respect to all matters not expressly included within the United States' covenants not to sue.  Notwithstanding any other provision of this Consent Decree, the United States reserves all rights against Settling Defendant with respect to:

      a.      claims based on a failure by Settling Defendant to meet a requirement of this Consent Decree;

      b.      claims based on a failure by Settling Defendant to meet a requirement of the consent decree entered in <u>United States v. General Electric Company, Inc.,</u> Civ. No. 90-CV-575 (N.D.N.Y.);

      c.      claims based on a failure by Settling Defendant to meet a requirement of an administrative order issued by EPA prior to the effective date of this Consent Decree;

      d.      liability arising from the past, present, or future disposal, release, or threat of release of Waste Material outside of the Upper Hudson Work Area;

      e.      liability based upon Settling Defendant's ownership or operation of the Site, or upon Settling Defendant's transportation, treatment, storage, or disposal, or the arrangement for the transportation, treatment, storage, or disposal of Waste Material at or in connection with the Site, other than as provided in the ROD, the Work, or otherwise ordered by EPA, after signature of this Consent Decree by Settling Defendant;

      f.      liability for damages for injury to, destruction of, or loss of natural resources, and for the costs of any natural resource damage assessments;