IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| STATE OF NEW YORK ET AL., ) <br> ) <br> Plaintiffs, ) <br> ) <br> v. ) <br> ) <br> UNITED STATES ENVIRONMENTAL ) <br> PROTECTION AGENCY ET AL., ) <br> ) <br> Defendants. ) | Civil Action No. 1:19-cv-01029-DNH-CFH |

**AFFIDAVIT OF JOHN G. HAGGARD**

John G. Haggard, being duly sworn, deposes and states as follows:

1. I am the Leader of Global Remediation for the General Electric Company (GE) and the GE Project Coordinator for the Hudson River Remedial Action under the Consent Decree (CD) entered by this Court in *United States v. General Electric Company* (Civil Action No. 1:05 CV-01270) on November 2, 2006, which has governed GE's implementation of that Remedial Action. I was the lead negotiator for the technical aspects of that Consent Decree, as well as previous Administrative Orders on Consent (AOCs) executed by GE and the United States Environmental Protection Agency (EPA) in 2002 and 2003 to govern the sampling for and design of that Remedial Action. I have been involved with the Hudson River project since 1991, and am familiar with all aspects of that project.

2. I am submitting this affidavit in support of GE's motion for leave to intervene in the above-entitled action by the State of New York, which challenges EPA's issuance of a

1

Certification of Completion to GE for the Hudson River Remedial Action that GE has completed under the CD. This affidavit is supported by certain exhibits, described herein.

3. In 2002, EPA issued a Record of Decision (ROD) for the Hudson River PCBs Site under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) setting forth a Remedial Action to address polychlorinated biphenyls (PCBs) in the sediments of the Hudson River. That Remedial Action involved the dredging and disposal of sediments from the Upper Hudson River (between Fort Edward and the Federal Dam at Troy) containing PCBs above certain specified criteria. The ROD called for this remedy to be conducted in two phases, designated Phase 1 and Phase 2. Phase 1 was to constitute the first year of the dredging project, to be performed at a reduced rate of work for evaluation purposes, and Phase 2 was to constitute the remainder of the dredging project. The ROD stated on page 106 that this selected remedy "is protective of human health and the environment." Relevant excerpts from the ROD are provided in Exhibit A.

4. The ROD included a letter from the New York State Department of Environmental Conservation (NYSDEC) stating that the State of New York concurred with the ROD, finding the selected remedy to be "protective of human health and the environment." A copy of that letter is included in Exhibit A.

5. After EPA selected the remedy, GE and EPA entered into an AOC in 2002 to govern the necessary sediment sampling to determine the areas to be dredged under the removal criteria specified in the ROD and by EPA, and they entered into another AOC in 2003 to govern the remedial design of the remedy. GE conducted extensive sediment sampling under the 2002 AOC and performed the necessary design activities under the 2003 AOC, including submission to EPA of numerous design documents for both Phase 1 and Phase 2 of the remedy. After

detailed review, EPA approved all of GE's design documents as appropriate to meet the requirements of the ROD.

6. During this process, GE completed and EPA approved reports delineating the horizontal and vertical extent of the areas to be dredged, in both Phase 1 and Phase 2, to meet the applicable removal criteria established by EPA and thereby to satisfy the requirements of the ROD for sediment removal. The areas to be dredged were divided into a total of 100 individual areas, known as Certification Units (CUs), which encompassed all of the areas in the Upper Hudson River that required dredging under the ROD.

7. In 2004-2005, GE conducted extensive negotiations with EPA and the U.S. Department of Justice on a Consent Decree to govern implementation of the Remedial Action. The State of New York participated in those negotiations through both NYSDEC and the office of the New York Attorney General (NY AG), although the State declined to sign the CD. The CD was executed and lodged with the District Court in October 2005, and was entered by the Court on November 2, 2006. The CD included, as Appendix B, a Statement of Work for Remedial Action and Operation, Maintenance, and Monitoring (SOW), which set forth the general requirements and procedures for the project.

8. The CD provided that GE would carry out Phase 1 of the dredging project (the first year), and that, after a post-Phase 1 peer review and EPA's decision on any changes to the performance standards and the scope of the project, GE would elect whether to perform the remainder of the dredging project (Phase 2) under the CD (CD ¶¶ 12, 15).[1] The CD provided that GE would perform Phase 1 and (if it so elects) Phase 2 of the Remedial Action in

---

[1] Relevant provisions of the CD are attached to GE's Memorandum of Law in Support of Unopposed Motion to Intervene as Defendant.

accordance with the CD, including its attachments (which include the SOW), the design reports and work plans approved by EPA, and all other requirements under the CD (CD ¶¶ 12.a & 12.b).

9. The CD defines the "Remedial Action" as all work to be undertaken to implement the ROD in accordance with the SOW and EPA-approved design and work plans (including Phase 1 and, if GE so elects, Phase 2), except for remedial design and post-construction operation, maintenance, and monitoring (OM&M) (CD ¶ 4). Completion of that work involved a three-step process for each CU specified for dredging: (1) dredging to the horizontal and vertical extents specified in the approved design; (2) placement of backfill or caps in the dredged areas, as required by the approved design and performance standards established by EPA; and (3) where necessary, restoration of the affected habitat in the dredged areas. The SOW established a procedure for EPA to approve each step in each CU, prior to proceeding to the next step, through its signature on a set of approval forms, signifying that that step had been completed in accordance with the CD and the approved design. The final EPA approval for each CU was to be provided in a Final CU Construction Completion Certification Form for that CU.

10. The CD provided that, upon the completion of Phase 1 field activities, GE would submit a Phase 1 Construction Report demonstrating the completion of those activities and requesting a Certification of Completion of those activities (¶ 56.b), and that if EPA concludes that the Phase 1 field activities have been completed in accordance with the CD, it would issue such a Certification of Completion (¶ 56.d).

11. The CD provided further that, if GE elected to perform Phase 2 under the CD, it would, upon completion of the Remedial Action (as defined in Paragraph 9 above), submit a Remedial Action Completion Report documenting that the Remedial Action has been completed in full satisfaction of the requirements of the CD and requesting that EPA issue a Certification of

4

Completion of the Remedial Action (¶ 57.b). The CD required that, if GE has completed the Remedial Action in accordance with the CD, EPA will issue such a Certification of Completion (¶ 57.d); and it provided that EPA would respond to GE's request for a Certification no later than 365 days after receipt of GE's request (¶ 57.e). The provision that EPA will issue such a Certification upon completion of the Remedial Action was and is considered by GE to be a critical component of the overall agreement embodied in the CD.

12. GE conducted Phase 1 dredging in 2009, with completion of the associated habitat restoration in Phase 1 dredge areas in 2011. Following the completion of Phase 1 dredging, as required by the ROD and the CD, an external peer review proceeding was conducted in 2010 to evaluate the project with respect to EPA's performance standards. In December 2010, following that peer review, EPA issued revised performance standards and a revised SOW for Phase 2, and GE agreed to conduct Phase 2 of the Remedial Action under the CD. GE commenced Phase 2 of the dredging in 2011.

13. In October 2011, GE submitted to EPA a Phase 1 Construction Completion Report demonstrating that the Phase 1 field activities had been completed in accordance with the CD. EPA subsequently issued a Certification of Completion of Phase 1 field activities on October 17, 2012.

14. GE conducted Phase 2 of the Remedial Action in 2011 through 2015, with final completion of the required habitat restoration in Phase 2 areas, as well as demobilization of GE's facilities, in 2016.

15. Both Phase 1 and Phase 2 of the Remedial Action were based on design documents and work plans that were thoroughly reviewed and approved by EPA, after an opportunity for review and comment by the State; and they were conducted in full compliance with the CD and

under direct day-to-day EPA oversight. During the course of the project, EPA approved the completion forms for all three steps of all 100 CUs that comprised the overall project, including all of the Final CU Construction Completion Certification Forms, thereby certifying that all of the required activities in those CUs had been completed in accordance with the CD and applicable requirements. GE received the last set of those signed forms from EPA in 2016.

16. The Remedial Action conducted by GE was one of the largest and most logistically complex environmental cleanups in history, removing more PCB mass and a higher percentage of the PCB mass in the river than projected by EPA. It removed, by GE's estimate, approximately 2.75 million cubic yards of sediment estimated to contain approximately 146,000 kilograms of total PCBs,[2] nearly 80% of the total PCB mass in the Upper Hudson River and substantially more than the PCB mass estimated in the ROD to be removed (69,800 kilograms). To implement the remedy, GE constructed and eventually decommissioned a 110-acre sediment processing facility along the Champlain Canal; and it deployed a fleet of surface vessels, including dredges, barges, tugs, and support vessels. All told, GE incurred costs of more than $1.7 billion to implement the Remedial Action.

17. On December 23, 2016, pursuant to the CD, GE submitted its Remedial Action Completion Report showing that it had completed the Remedial Action in full satisfaction of the requirements of the CD and requesting that EPA issue a Certification of Completion as required by the CD. That report demonstrated in detail that GE implemented the ROD remedy in accordance with the CD, the SOW and its attachments, the design submittals and work plans approved by EPA, and all other requirements under the CD.

---

[2] These estimates are similar to those made by EPA, which has estimated that the overall Remedial Action removed 2.63 million cubic years of sediment containing 156,000 kilograms of total PCBs.

6

18. Following receipt of the Remedial Action Completion Report, EPA did not raise any question about the report's conclusion that GE had completed the Remedial Action in accordance with the requirements of the CD. This was not surprising, because, as noted above, EPA had already signed Final CU Construction Completion Certification Forms for all 100 individual CUs.

19. On January 2, 2018, EPA sent a letter to me stating that, prior to responding to GE's request for Certification, EPA expected to finalize a separate report, known as the Second Five-Year Review Report (which EPA had issued in draft on June 1, 2017), and that "finalizing that report has taken longer than we anticipated." That report was required by a separate provision of CERCLA requiring EPA to evaluate remedial actions at five-year intervals from initiation to ensure that they are protective of human health and the environment. Under the CD, that report was wholly unrelated to EPA's issuance of a Certification of Completion.

20. During 2018, EPA continued to work on the Five-Year Review Report and to review GE's Remedial Action Completion Report. It also collaborated with NYSDEC in an extensive technical review of sediment samples collected from the river by both GE and NYSDEC following the completion of dredging, as well as post-dredging fish sampling data.

21. On December 26, 2018, EPA provided comments to GE on the December 2016 Remedial Action Completion Report. Those comments were minor and technical in nature; they did not require GE to conduct any additional work and did not in any way question GE's conclusion that it had completed the Remedial Action in accordance with the CD. GE revised the report to address those comments, and it submitted an updated Remedial Action Completion Report to EPA on March 6, 2019, along with a reiteration of GE's request that EPA issue a Certification of Completion.

22. On April 11, 2019, EPA issued a Certification of Completion of the Remedial Action to GE pursuant to Paragraph 57.d of the CD. A copy is attached as <u>Exhibit B</u>. In that document, EPA "certifie[d] that the activities comprising the Remedial Action, as specifically defined [in the CD], have been performed in accordance with the Consent Decree" (p. 1).

23. On the same date, EPA issued a final Second Five-Year Review Report. In that report, EPA confirmed that the construction portion of the remedy was complete and explained that the project had now entered the OM&M stage in which monitoring data will be collected over time to continue to evaluate the effectiveness of the remedy that was implemented.

24. As the GE Project Coordinator for the Hudson River Remedial Action under the Court-approved CD, and having been involved with that Remedial Action since its inception, I submit that GE fully performed its obligations under the CD and was entitled to the Certification of Completion from EPA as required by the CD.

Executed on September 19, 2019.

_____
John G. Haggard

STATE OF NEW HAMPSHIRE

County of Hillsborough, ss.

On this 19th day of September, 2019, before me, the undersigned notary public, personally appeared John G. Haggard, proved to me through satisfactory evidence of identification, which was _NH Drivers License_, to be the person whose name is signed on the preceding document, and acknowledged to me that he signed it voluntarily for its stated purpose.

_____, Notary Public
My commission expires:

Michael S Murphy
Notary Public, State of New Hampshire
My Commission Expires Feb. 20, 2024

8