**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| STATE OF NEW YORK ET AL., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Civil Action No. 1:19-cv-01029-DNH-CFH |
| | ) |
| UNITED STATES ENVIRONMENTAL | ) |
| PROTECTION AGENCY ET AL., | ) |
| | ) |
| Defendants. | ) |

## GENERAL ELECTRIC COMPANY'S MEMORANDUM OF LAW
## IN SUPPORT OF ITS MOTION TO DISMISS COMPLAINT

Samuel I. Gutter
10e Cape Codder Road
Falmouth, MA 02540
(508) 540-0180
sgutter@outlook.com

Eric S. Merrifield
Executive Counsel
General Electric Company
P.O. Box 2049
Poulsbo, WA 98370
(518) 527-5140
eric.merrifield@ge.com

Kristin Carter Rowe
Dean S. Sommer
YOUNG/SOMMER LLC
Five Palisades Drive
Albany, NY 12205
(518) 438-9907
krowe@youngsommer.com
dsommer@youngsommer.com

James R. Bieke
Peter D. Keisler
Timothy K. Webster
SIDLEY AUSTIN, LLP
1501 K Street, N.W.
Washington, D.C. 20005
(202) 736-8000
jbieke@sidley.com
pkeisler@sidley.com
twebster@sidley.com

*Attorneys for Intervenor-Defendant General Electric Company*

Dated: November 20, 2019

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iii

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................. 4

    A. The Record of Decision and Administrative Orders on Sampling and Design ............... 4

    B. The Consent Decree .................................................................................................. 5

    C. Performance of the Remedial Action ......................................................................... 8

    D. EPA's Issuance of the Certification of Completion .................................................... 9

    E. The State's Lawsuit ................................................................................................. 10

ARGUMENT .................................................................................................................... 11

I.   THE STATE'S COMPLAINT DOES NOT STATE A CLAIM FOR RELIEF BECAUSE THE CONSENT
    DECREE REQUIRED EPA TO ISSUE THE CERTIFICATION OF COMPLETION BASED SOLELY ON
    GE'S PERFORMANCE OF THE REMEDIAL ACTION, AND THAT REQUIREMENT IS FULLY
    CONSISTENT WITH CERCLA ......................................................................................... 11

    A. The Consent Decree Required EPA to Issue a Certification of Completion Solely
       Upon Completion of the Remedial Action. .............................................................. 12

    B. The Consent Decree's Requirement that EPA Issue a Certification upon Completion
       of the Remedial Action is Consistent with CERCLA. ............................................... 14

        1. The State's argument contradicts CERCLA's plain language. ............................... 14

        2. The State's argument contradicts EPA guidance and EPA's positions at the time
           the Consent Decree was entered ........................................................................ 18

        3. The State's position is inconsistent with case law ................................................ 19

        4. The State's position would preclude issuance of a certification of completion
           until many years after completion of a remedial action, contrary to CERCLA
           and the Consent Decree ..................................................................................... 20

    II. THE STATE'S LAWSUIT CONSTITUTES AN IMPERMISSIBLE AND UNTIMELY CHALLENGE
        TO THE CONSENT DECREE. ....................................................................................... 22

        A. The State's Suit is Not Authorized by the APA. ..................................................... 22

        B. The State's Suit is Time-Barred. ........................................................................... 23

CONCLUSION ............................................................................................................24

EXHIBITS attached to the Affirmation of Dean S. Sommer, dated November 20, 2019:

A.  Excerpts from Consent Decree in *United States v. General Electric Co.* (N.D.N.Y., entered Nov. 2, 2006)

B.  Excerpts from EPA's *Record of Decision, Hudson River PCBs Site* (February 1, 2002)

C.  Excerpts from General Electric Company's *Remedial Action Completion Report* (December 2016; updated March 2019)

D.  Excerpts from EPA's *Final Second Five-Year Review Report for the Hudson River PCBs Superfund Site* (April 11, 2019)

E.  October 1, 2015 Statement from EPA on Hudson River Cleanup

F.  Letter from EPA to John Haggard of GE regarding Certification of Completion of Remedial Action Under 2006 Consent Decree (April 11, 2019)

# TABLE OF AUTHORITIES

**Cases**

*Berger v. Heckler,*
    771 F.2d 1556 (2d Cir. 1985)..................................................................12

*Bowen v. Massachusetts,*
    487 U.S. 879 (1988)..............................................................................22

*Carter v. Welles-Bowen Realty, Inc.,*
    736 F.3d 722 (6th Cir. 2013) ................................................................17

*Cayuga Indian Nation of N.Y. v. Pataki,*
    413 F.3d 266 (2d Cir. 2005)..................................................................24

*Doe v. Pataki,*
    481 F.3d 69 (2d Cir. 2007)....................................................................12

*EEOC v. New York Times Co.,*
    196 F.3d 72 (2d Cir. 1999)....................................................................12

*Hinojosa v. Horn,*
    896 F.3d 305 (5th Cir. 2018) ................................................................22

*Manfredonia v. SEC,*
    No. 08-cv-1678, 2009 WL 4505510 (E.D.N.Y. Dec. 3, 2009)................23

*Town of Fort Edward v. United States,*
    No. 06-5535-cv (2d Cir. Jan. 3, 2008) .............................................1, 8

*United States v. Akzo Coatings of Am., Inc.,*
    949 F.2d 1409 (6th Cir. 1991) ........................................................19, 21

*United States v. Armour & Co.,*
    402 U.S. 673 (1971)..............................................................................12

*United States v. Broadcast Music, Inc.,*
    275 F.3d 168 (2d Cir. 2001)............................................................12-13

*United States v. City of Loveland,*
    621 F.3d 465 (6th Cir. 2010) ................................................................24

*United States v. General Electric Co.,*
    460 F. Supp. 2d 395 (N.D.N.Y. 2006)........................1, 5, 7, 15, 16, 19

*United States v. Int'l Bhd. of Teamsters,*
    961 F. Supp. 665 (S.D.N.Y. 1997), *aff'd* 119 F.3d 210 (2d Cir. 1997)................23

*United States v. ITT Cont'l Baking Co.*,
420 U.S. 223 (1975)..................................................................................12

*United States v. Kubrick*,
444 U.S. 111 (1979)..................................................................................24

**Statutes**

Administrative Procedure Act
5 U.S.C § 704.........................................................................................22

Declaratory Judgment Act
28 U.S.C. § 2201....................................................................................23

28 U.S.C. § 2401...........................................................................................23

Comprehensive Environmental Response, Compensation, and Liability Act
Section 101(24), 42 U.S.C. § 9601(24) ...................................................1
Section 121(c), 42 U.S.C. § 9621(c)................................................10, 18
Section 121(d), 42 U.S.C. § 9621(d) ..........................................14, 15, 16
Section 122(f), 42 U.S.C. § 9622(f)...................... 13-14, 15, 16, 17, 18, 20

**Other Authorities**

*Superfund Programs; Covenants Not To Sue*, 52 Fed. Reg. 28038 (July 27, 1987) ............... 18-19

## INTRODUCTION

General Electric Company ("GE"), as intervenor-defendant in this action, submits this memorandum in support of its motion to dismiss the complaint filed by the State of New York, the New York State Department of Environmental Conservation ("NYSDEC"), and NYSDEC Commissioner Basil Seggos (collectively "the State").[1] The State's complaint challenges and seeks to set aside a Certification of Completion issued to GE by the U.S. Environmental Protection Agency ("EPA") for the Remedial Action conducted by GE in the Hudson River pursuant to the terms of a Consent Decree ("CD" or "Decree") executed by GE and the United States in 2005 pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), which was approved and entered by this Court in 2006. *United States v. General Electric Co.*, 460 F. Supp. 2d 395 (N.D.N.Y. 2006), *aff'd sub nom. Town of Fort Edward v. United States*, No. 06-5535-cv (2d Cir. Jan. 3, 2008).

The Consent Decree is clear: Once GE has completed the Remedial Action, as that term is defined in the Decree (hereinafter "Remedial Action"),[2] EPA is *required* to issue a Certification

---

[1] This memorandum is supported by several exhibits, which – for the Court's convenience – are attached to the accompanying Affirmation of Dean S. Sommer and listed in the Table of Contents. These exhibits consist of excerpts from the subject Consent Decree (Exhibit A) and from other documents that are cited in the State's complaint, part of this Court's records or otherwise publicly available and subject to judicial notice (Exhibits B through F). These exhibits are provided as background for GE's motion to dismiss. However, GE's motion presents a purely legal issue which can be decided based solely on the Consent Decree and the law.

[2] "Remedial Action" is defined in the Consent Decree to "mean those activities, except for Remedial Design and Operation, Maintenance and Monitoring, to be undertaken to implement the ROD, in accordance with the Statement of Work, the final Remedial Design plans and reports, the Remedial Action Work Plans, and other plans approved by EPA." CD ¶ 4 at p. 9. It should be noted that the term "remedial action" as defined in CERCLA (Section 101(24), 42 U.S.C. § 9601(24)) is distinct from the definition of "Remedial Action" in the Consent Decree.

of Completion for that Remedial Action. CD ¶ 57.d. There is no dispute that GE has met this condition. In reliance on the Decree, GE spent seven years and more than $1.7 billion performing and ultimately completing the Remedial Action required by the Decree, thereby earning its entitlement to the Certification of Completion as the receipt for its substantial efforts. The State acknowledges GE's "completion of the remedial work required by the Consent Decree," Complaint ¶ 37; but it now wants to change and amend the plain terms of the agreement embodied in the Decree and inject a new condition, that EPA make a separate and independent determination, prior to issuing the Certification of Completion of the Remedial Action, that the remedy "implemented and to be implemented by GE will be protective of human health and the environment." *Id.* ¶ 41; *see also id.* ¶ 43.

The State's position cannot be reconciled with the plain language of the Consent Decree and has no basis in CERCLA or applicable precedent. The parties' agreement embodied in the Consent Decree is clear and, as this Court found in approving the Decree, fully consistent with CERCLA. The State's effort to rewrite the terms of that agreement 13 years after it was approved and entered by this Court, and after GE spent $1.7 billion in reliance on its terms, is without merit and must be rejected as a matter of law.

Under the Consent Decree, EPA's issuance of the Certification of Completion triggers a covenant that limits the United States from requiring GE to implement further dredging, except in defined circumstances. *See* CD ¶¶ 98.f, 99.b. As discussed further below, that covenant, which was a critical element of the parties' settlement, springs from the clear language of the Consent Decree and the requirements of CERCLA. At the same time, the covenant does not release GE from all future accountability regarding the Hudson River. EPA's 2002 Record of Decision ("ROD") selecting the remedy for the Hudson River recognized that it would take decades for the

2

Remedial Action component of the remedy to achieve the desired long-term remediation goals through post-implementation natural recovery of the river (ROD at 73, 106).[3] During that period, GE must engage in long-term monitoring and sampling efforts to assess PCB concentration levels over time, to monitor PCB transport, and to assess the long-term effectiveness of the Remedial Action. This monitoring and sampling are a component of the overall remedy selected by EPA in 2002 and are part of the overall "Work" required by the Consent Decree,[4] at the conclusion of which EPA will issue another, final Certification of Completion for that overall Work. CD ¶ 58. But those activities are *not* part of the Remedial Action, as that term is defined in the Decree. CD ¶ 4. The covenant also retains EPA's ability to pursue future action against GE if it later determines, based on the monitoring that GE is required to conduct or other new information, that the remedy does not ultimately prove to be protective.

Fundamentally, the State conflates two separate sets of EPA obligations. First, EPA had a non-discretionary contractual duty under the Consent Decree to issue a Certification of Completion *for the Remedial Action* when GE completed the Remedial Action required by the Decree, even though EPA's ROD anticipates that years of natural recovery will be necessary before the remediation goals are achieved and even though GE is still required to perform long-term monitoring and sampling as part of the overall Work required by the Consent Decree. Second, as an entirely separate matter, EPA has a continuing obligation under CERCLA to evaluate the protectiveness of the selected remedy at five-year intervals. The State's Complaint conflates these

---

[3] Pertinent excerpts from the ROD are provided in Exhibit B.

[4] The "Work" required by the Consent Decree includes the Remedial Action (defined in footnote 2 above) as well as additional Operation, Maintenance and Monitoring. CD ¶ 4 at pp. 6, 10. The current Certification of Completion of the Remedial Action issued by EPA to GE is the second in a series of three; the first was issued in 2012 following the first phase of the Remedial Action, and the third will not be issued to GE until GE completes all of the "Work" required by the Consent Decree, including long-term sampling and monitoring.

two, very separate, sets of requirements, improperly grafting EPA's obligation to evaluate the protectiveness of the selected remedy onto the parties' settlement agreement for the implementation of the Remedial Action.

Moreover, given the clear language of the Consent Decree requiring EPA to issue a Certification of Completion based solely on GE's completion of the Remedial Action, the State's action constitutes a challenge to that Decree, a prior Order and Judgment of this Court. As such, it is not authorized by the Administrative Procedure Act ("APA") and is untimely. At the time the Consent Decree was before the Court back in 2005-2006, the State could have challenged the Decree on the asserted ground that its failure to condition the issuance of a Certification of Completion on a finding of protectiveness was a violation of CERCLA. The State did not do so and thus is barred from doing so now, over a decade later, after GE has fully implemented the Remedial Action in reliance on the plain terms of the Decree.

## BACKGROUND

### A. The Record of Decision and Administrative Orders on Sampling and Design

In 2002, EPA issued a ROD under CERCLA selecting a remedy involving the dredging and disposal of sediments containing polychlorinated biphenyls ("PCBs") above certain specified numerical criteria from the Upper Hudson River (between Fort Edward and the Federal Dam at Troy). The ROD called for the remedy to be conducted in two phases. Phase 1 was to constitute the first year of the dredging project, to be performed for evaluation purposes, and Phase 2 was to constitute the remainder of the dredging project. ROD at iii, 100. The State concurred in EPA's selected remedy. ROD Appendix B.

Although the ROD noted that the remedy was expected to achieve certain remediation goals in fish, water, and sediments over time (*id.* at 50-51), the ROD recognized that achievement

of those goals would take a considerable number of years and that it would, in fact, take decades to reach EPA's ultimate goal of allowing unrestricted fish consumption.[5] Even with that recognition, EPA determined in the ROD that the "selected remedy is protective of human health and the environment" (*id.* at 106), and the State joined in that determination. *Id.* Appendix B at 4. It was fully understood that monitoring after dredging was an integral part of the remedy and that the resulting monitoring data would allow for and be the basis of future evaluation of the remedy. *Id.* at iv, 61.

After EPA selected the remedy, GE and EPA executed two Administrative Orders on Consent, under which GE conducted extensive sediment sampling to determine the areas to be dredged and performed the necessary remedial design activities for the Remedial Action, all subject to EPA's review and approval. *See* 460 F. Supp. 2d at 398.

**B. The Consent Decree**

Not surprisingly, given the scope, complexity, and expense of EPA's selected remedy, EPA and GE negotiated for more than a year to reach the settlement agreement embodied in the Consent Decree, pursuant to which GE agreed to implement the remedy. The State participated in those negotiations. GE executed the Consent Decree with the U.S. in the fall of 2005 to govern implementation of the remedy.

---

[5] For example, although the specific times presented in the ROD to reach target levels were not themselves objectives of the remedy, the ROD recognized that, under the selected remedy (known as "REM-3/10-Select"), achievement of the fish goal that would allow consumption of one fish meal per week – a PCB level of 0.05 milligram per kilogram (mg/kg) – would not be achieved for at least 43 to 59 years from completion of dredging, depending on the section of the river. ROD at 73, 106. Moreover, it was anticipated that achievement of interim goals of 0.4 and 0.2 mg/kg, which would allow for lesser amounts of fish consumption, would still take several years after remedy completion. *Id.* at 72-73, 106.

Consistent with the ROD, the Consent Decree provided for the Remedial Action specified in the ROD to be performed in two phases. It provided that GE would carry out the first year of the dredging project (Phase 1) for evaluation purposes, and that, after a post-Phase 1 peer review and EPA's decision on any changes to the performance standards and the scope of the project, GE would elect whether to perform the remainder of the dredging project (Phase 2). CD ¶¶ 12, 14, 15. The Decree included, as Appendix B, a Statement of Work for Remedial Action and Operation, Maintenance, and Monitoring ("Statement of Work"), which set forth the general requirements for the project. *See id.* ¶ 4.

The Consent Decree defines the Remedial Action to include the dredging project, but not the post-construction monitoring and maintenance. CD ¶ 4. Pursuant to the terms of the Consent Decree, upon its completion of the Remedial Action, GE was required to submit a Remedial Action Completion Report to EPA documenting that the Remedial Action had been completed in full satisfaction of the Consent Decree requirements and requesting that EPA issue a Certification of Completion of the Remedial Action. *Id.* ¶ 57.b. The Decree required that, if EPA concludes that the Remedial Action had been conducted in accordance with the Decree, it "will so certify in writing" by issuing GE a Certification of Completion. *Id.* ¶ 57.d. The Consent Decree contains no other pre-conditions for issuance of the Certification. Indeed, the Decree expressly states that, in determining whether the Remedial Action is complete, EPA *cannot* require GE to perform activities that would go beyond the scope of the remedy selected in the ROD or required by the Statement of Work. *Id.* ¶ 57.c.(1).

The Consent Decree further mandates that, upon issuance of the Certification of Completion, GE will receive a covenant from the U.S. not to sue or take action against GE "for administrative or judicial injunctive-type relief with respect to PCB contamination in the Upper

Hudson River, or for reimbursement of response costs in connection with the Upper Hudson River." *Id.* ¶ 98.f. The Decree provides that the covenant takes effect when EPA issues the Certification of Completion of the Remedial Action. *Id.* ¶ 99.b. This covenant is subject to EPA's right to seek such additional response actions or costs if, in the future, previously unknown information or conditions are discovered and "EPA determines that these previously unknown conditions or information together with any other relevant information indicates that the Remedial Action is not protective of human health of the environment." *Id.* ¶ 101.b.

This negotiated agreement is a common component of federal consent decrees in which a private party agrees with EPA to implement a cleanup under CERCLA. It is a critical element of this and other similar settlement agreements, because it defines the protection that a settling party receives in return for agreeing to implement a remedy prescribed by EPA.

This Court approved the Consent Decree on November 2, 2006. Following a thorough review of the parties' agreement, the Court concluded: "Having given careful consideration to all the provisions of the proposed Consent Decree, it is determined that it is reasonable, fair, consistent with CERCLA, and in the public interest." 460 F. Supp. 2d at 404. *See also* CD ¶ I.S (stating that "this Consent Decree is fair, reasonable, and in the public interest.").

While the State participated in the Consent Decree negotiations and submitted comments on the proposed Decree, it did not raise any question about the requirements or conditions for the issuance of a Certification of Completion.[6] Further, while the State submitted a letter to the Court

---

[6] *See* Plaintiff's Memorandum of Law in Support of Submission Requesting Entry of Consent Decree, submitted in *United States v. General Electric Co.*, No. 05-cv-01270-DNH-RFT (May 16, 2006) ("U.S. Mem. In Support of CD Entry") (Document No. 20 on the Docket Sheet), Exhibit 3 (Comments of New York Office of Attorney General) (Document No. 20-3, pp. 10-17) and Exhibit 4 (Comments of New York State Department of Environmental Conservation) (Document No. 20-3, pp. 19-24).

as a proposed *amicus curiae* in the proceeding to approve the Decree,[7] that letter did not challenge GE's right to a Certification of Completion upon its completion of the Remedial Action. Nor did the State oppose the Court's approval and entry of the Consent Decree as proposed, even though – as demonstrated by the actions of another party – that opportunity was clearly available.[8] In any event, the time to challenge the Court's approval and entry of the Decree has long since expired.

### C. Performance of the Remedial Action

GE conducted Phase 1 of the Remedial Action in 2009, with completion of the associated habitat restoration in 2011.[9] In December 2010, following a peer review, EPA issued revised performance standards and a revised Statement of Work, and GE agreed to conduct Phase 2 of the Remedial Action. GE conducted Phase 2 in 2011 through 2015, with final completion of the required restoration, as well as demobilization of GE's facilities, in 2016.[10]

EPA divided the areas to be dredged by GE into a total of 100 individual areas, known as Certification Units, which encompassed all of the areas in the Upper Hudson River that required dredging under the ROD. EPA established a three-step process for conducting the necessary work in each Certification Unit: (1) dredging to the extent specified in the approved design; (2) placement of backfill or caps in the dredged areas; and (3) as necessary, restoration of the affected

---

[7] *See* Letter from Eugene J. Leff, Assistant Attorney General of New York, to the Honorable David N. Hurd, in *United States v. General Electric Co.*, No. 05-cv-01270-DNH-RFT (July 31, 2006).

[8] Only one party, the Town of Fort Edward, challenged the Consent Decree in Court, and that challenge was on grounds not relevant here. This Court rejected that challenge in its above-cited decision, and that decision was upheld on appeal by the Court of Appeals for the Second Circuit. *Town of Fort Edward v. United States*, No. 06-5535-cv (2d Cir. Jan. 3, 2008).

[9] In accordance with Paragraph 56.e of the Consent Decree, EPA issued a Certification of Completion of Phase 1 on October 17, 2012.

[10] *See* GE's Remedial Action Completion Report, dated December 2016 and updated March 2019 ("RA Completion Report") at 1-4. Excerpts from that report are provided in Exhibit C.

habitat in the dredged areas. EPA approved GE's completion of each of these three steps in each Certification Unit through its signature on a set of 300 approval forms covering all 100 Certification Units.[11] Together, EPA's signed approval forms constitute EPA's acknowledgement that GE completed all of the required remedial activities in accordance with the Consent Decree, EPA's approved design, and any other applicable requirements.

The Remedial Action conducted by GE was one of the largest and most complex environmental cleanups in history, removing significantly more PCB mass than projected by EPA.[12] GE spent more than $1.7 billion in implementing that Remedial Action, which EPA has characterized as an "historic achievement for the recovery of the Hudson River." Exhibit E.

### D. EPA's Issuance of the Certification of Completion

On December 23, 2016, GE submitted its Remedial Action Completion Report ("RA Completion Report") to EPA requesting issuance of the Certification in accordance with the terms of the Decree. That report demonstrated that GE had completed the Remedial Action in compliance with the Consent Decree, the Statement of Work and its attachments, and the design submittals and work plans approved by EPA (none of which the State challenges). Following minor revisions to address comments from EPA (which did not question GE's completion of the

---

[11] *See* RA Completion Report at 1-4. The approved completion forms, signed by EPA, for all Certification Units are included in appendices to the RA Completion Report, as described in Sections 8.1 and 8.2 of that report (in Exhibit C).

[12] The Remedial Action removed, by GE's estimate, approximately 2.75 million cubic yards of sediment estimated to contain approximately 146,000 kilograms of total PCBs (RA Completion Report at 2-8, 2-9, and 2-11), and, by EPA's estimate, approximately 2.63 million cubic yards of sediment containing approximately 156,000 kilograms of total PCBs. *See* EPA's *Final Second Five-Year Review Report for the Hudson River PCBs Superfund Site*, dated April 11, 2019 ("Second Five-Year Review") (discussed below) at 5, 43. Excerpts from that report are provided in Exhibit D. In both cases, this was substantially more than the PCB mass estimated in the ROD to be removed (69,800 kilograms). *See id.* at 43.

Remedial Action), GE submitted an updated RA Completion Report to EPA on March 6, 2019, along with a reiteration of GE's request that EPA issue a Certification of Completion.

On April 11, 2019, EPA issued a Certification of Completion to GE, which "certifie[d] that the activities comprising the Remedial Action, as specifically defined [in the Consent Decree], have been performed in accordance with the Consent Decree."[13]

### E. The State's Lawsuit

On August 21, 2019 – approximately 13 years after the Court approved and entered the Consent Decree as a final Order and Judgment – the State commenced this action against EPA under the APA, seeking to void and vacate EPA's issuance of the Certification of Completion as unlawful because EPA has not yet made a specific, separate determination that the remedy selected in the ROD is, at present, protective of human health and the environment.

The State's complaint is predicated on a remedy review report, known as the Second Five-Year Review Report ("Second Five-Year Review"), which EPA also issued on April 11, 2019. That report is required by a separate provision of CERCLA, Section 121(c), which requires EPA to evaluate the remedy at five-year intervals from initiation to ensure that the remedy is protective of human health and the environment. 42 U.S.C. § 9621(c).[14] Under CERCLA and the plain terms of the Consent Decree, issuance of the Certification under the Consent Decree and completion of the Five-Year Review process are separate, distinct processes that address fundamentally different questions. Under the Consent Decree, the *only* relevant inquiry for issuance of the Certification is whether GE has completed the Remedial Action in accordance with the Decree, the Statement of

---

[13] Letter from EPA to John Haggard of GE regarding Certification of Completion of Remedial Action Under 2006 Consent Decree (April 11, 2019) (Exhibit F).

[14] EPA had previously issued its First Five-Year Review Report in 2012, while the Remedial Action was ongoing. *See* Second Five-Year Review at 1.

Work, and the approved design (which the State acknowledges GE has done – Complaint ¶ 37),

whereas the Five-Year Review is a periodic assessment – to be repeated indefinitely at five-year

intervals – of whether the remedy selected in the ROD is working to protect human health and the

environment.[15]

On September 23, 2019, GE moved to intervene in this action as a defendant without

opposition. On October 22, 2019, on stipulation of the parties, the Court granted GE's motion to

intervene as of right.

## ARGUMENT

**I.   THE STATE'S COMPLAINT DOES NOT STATE A CLAIM FOR RELIEF BECAUSE THE CONSENT DECREE REQUIRED EPA TO ISSUE THE CERTIFICATION OF COMPLETION BASED SOLELY ON GE'S PERFORMANCE OF THE REMEDIAL ACTION, AND THAT REQUIREMENT IS FULLY CONSISTENT WITH CERCLA.**

The State's complaint fails as a matter of law to state a claim on which relief may be

granted. It is clear, and the State's complaint does not dispute, that: (1) the Consent Decree

required EPA to issue a Certification of Completion when GE completed the Remedial Action in

accordance with the Decree; and (2) GE completed the Remedial Action in accordance with the

Decree.[16] EPA was thus following the plain and unambiguous terms of the Consent Decree in

_____

[15] Significantly, the Second Five Year Review did *not* find that the remedy selected in the ROD is *not* protective, only that EPA's evaluation is ongoing. In that report (excerpts in Exhibit D), EPA confirmed that the construction portion of the remedy had been implemented consistent with the ROD, noted that the limited post-dredging data to date indicate that the remedy is consistent with the modeling analyses and expectations in the ROD, and explained that eight years or more of additional data will need to be collected during the post-construction monitoring stage to evaluate rates of decline in PCB concentrations, notably in fish, to determine if they are reasonably consistent with those predicted in the ROD. *Id.* at 4, 9. EPA specifically found that natural recovery was occurring in the river, "and these processes are expected to result in the River eventually reaching the long-term remediation goal for the protection of human health with regard to fish consumption." *Id.* at 9.

[16] *See* Complaint ¶ 37, objecting to the Certification "notwithstanding GE's completion of the remedial work required by the Consent Decree."

11

issuing the Certification. The State's argument that EPA nevertheless acted unlawfully in issuing the Certification is based on a fundamentally flawed premise – that there is a second pre-condition for such issuance, namely, that EPA must make an affirmative determination, following the completion of the Remedial Action, that the remedy "implemented and to be implemented by GE will be protective of human health and the environment." Complaint ¶ 41. There is no such requirement, either in the Decree or in CERCLA. While EPA has an ongoing, long-term obligation to evaluate whether the remedy is protective, that responsibility is wholly independent of GE's right to receive a Certification of Completion as to the Remedial Action implemented.

### A. The Consent Decree Required EPA to Issue a Certification of Completion Solely Upon Completion of the Remedial Action.

The Consent Decree is both a binding contract and a judicial order. *See, e.g., Berger v. Heckler*, 771 F.2d 1556, 1567 (2d Cir. 1985) ("Consent decrees are a hybrid in the sense that they are at once both contracts and orders"). It is well settled that consent decrees "should be construed basically as contracts, without reference to the legislation the Government originally sought to enforce but never proved applicable through litigation." *United States v. ITT Cont'l Baking Co.*, 420 U.S. 223, 236-37 (1975). This is the "four corners" rule, originally established in *United States v. Armour & Co.*, 402 U.S. 673, 682 (1971), that any clear command of a consent decree or order must be found "within its four corners." Thus, courts defer "to the plain meaning of the language of the decree." *United States v. Broadcast Music. Inc.*, 275 F.3d 168, 175 (2d Cir. 2001) (quoting *Berger*, 771 F.2d at 1568).[17]

---

[17] *See also EEOC v. New York Times Co.*, 196 F.3d 72, 78 (2d Cir. 1999) ("We read and apply a decree within its four corners and may not look beyond the document to satisfy one of the parties' purposes") (internal quotations omitted); *Doe v. Pataki*, 481 F.3d 69, 75 (2d Cir. 2007) ("Such decrees reflect a contract between the parties (as well as a judicial pronouncement), and ordinary rules of contract interpretation are generally applicable"); and *Broadcast Music, 275 F.3d at 175

Here the Consent Decree unambiguously *required* EPA to issue the Certification upon a determination that the Remedial Action (defined to exclude post-construction monitoring and maintenance) "has been performed in accordance with this Consent Decree." CD ¶ 57.d. As noted above, the Consent Decree required GE to perform the Remedial Action in accordance with the Decree, the Statement of Work and its attachments, and the design submittals and work plans approved by EPA. *Id.* ¶ 12. Thus, the *only* relevant question for EPA was whether GE completed the Remedial Action in accordance with those requirements. In fact, the Decree explicitly provides that, in determining whether the Remedial Action is complete, EPA *cannot* require GE to perform activities that would go beyond the scope of the remedy selected in the ROD or required by the Statement of Work. *Id.* ¶ 57.c.(1). Because GE showed that it had completed the Remedial Action in accordance with the specified requirements, *which the State concedes* (Complaint ¶ 37), EPA had a non-discretionary obligation to issue the Certification of Completion. *See* CD ¶ 2 (The CD "applies to and is binding upon the United States"). The Certification, in turn, triggered the covenant not to sue (*id.* ¶ 98.f), which was a key part of the parties' settlement agreement.

The Court-approved settlement agreement between the parties is fully consistent with CERCLA, which expressly provides, in Section 122(f)(5), that "[a]ny covenant not to sue under this subsection *shall be subject to the satisfactory performance by such party of its obligations under the agreement concerned*" (emphasis added). 42 U.S.C. § 9622(f)(5). *See also* Section I.B for further discussion of CERCLA's requirements.

Apart from completion of the Remedial Action, there are no other pre-conditions in the Consent Decree for issuance of the Certification of Completion. In particular, EPA's mandatory

---

("Because consent decrees embody a compromise between parties who have waived their rights to litigation, they should be construed basically as contracts") (internal quotations omitted).

obligation to issue a Certification under the Decree is unrelated to the question whether the remedy chosen by EPA in the ROD is ultimately shown to be fully protective of human health and the environment, a possibility that does not negate GE's entitlement to the Certification and that is separately addressed by the carefully crafted "reopener" provisions of the Decree (CD ¶ 101.b), discussed further below. GE's obligation under the Consent Decree was to perform the Remedial Action in accordance with the Decree, the Statement of Work, and the EPA-approved design, which GE did, which EPA certified and which the State does not dispute.

### B. The Consent Decree's Requirement that EPA Issue a Certification upon Completion of the Remedial Action is Consistent with CERCLA.

The State claims that, despite the unambiguous language of the Consent Decree, CERCLA precluded EPA from issuing a Certification of Completion for the Hudson River Remedial Action prior to making a separate, post-construction finding that the remedy selected in the ROD is protective of human health and the environment. Complaint ¶¶ 39-41. That argument is legally incorrect, represents an improper conflation of Sections 121(d)(1) and 122(f) of CERCLA, 42 U.S.C. §§ 9621(d)(1) and 9622(f), and is inconsistent with EPA guidance and EPA's position at the time the Consent Decree was entered.

### 1. The State's argument contradicts CERCLA's plain language.

Section 121(d)(1) of CERCLA requires *the selection* of a remedy that is protective of human health and the environment ("Remedial actions *selected* under this section or otherwise required or agreed to by [EPA] shall attain a degree of cleanup . . . which assures protection of human health and the environment") (emphasis added).[18] Consistent with this requirement, EPA

---

[18] The State's complaint misstates Section 121(d)(1) as requiring "that remedial action, *upon completion,* achieve a degree of cleanup that assures protection of human health and the environment." Complaint ¶ 39 (emphasis added). The emphasized words were added by the State; they are not in the statute.

concluded in the ROD that "[t]he selected remedy is protective of human health and the environment," even though it will take decades after implementation of the Remedial Action for the selected remedy to achieve remediation goals. ROD at vi, 106. The State of New York also found "the selected remedy to be protective of human health and the environment." ROD Appendix B at 4 (in Exhibit B). In approving the Consent Decree, the Court discussed the selected dredging remedy at length and concluded that it was "reasonable, fair, *consistent with CERCLA*, and in the public interest." 460 F. Supp. 2d at 404 (emphasis added).

A separate section of CERCLA addresses EPA's authority to issue covenants not to sue. Specifically, Section 122(f)(1) of CERCLA empowers EPA to issue a covenant not to sue if four conditions are satisfied: (A) it "is in the public interest"; (B) it "would expedite response action consistent with the National Contingency Plan"; (C) the receiving party "is in full compliance with a consent decree . . . for response to the release or threatened release concerned"; and (D) "[t]he response action has been approved by the [EPA]." 42 U.S.C. § 9622(f)(1). Notably absent from this CERCLA provision is any requirement that EPA determine at the completion of the construction phase of a remedy (here the Remedial Action as defined in the Consent Decree) that the remedy is protective of human health and the environment. That omission wholly negates the State's argument in this case.

By approving and entering the Consent Decree, the Court necessarily determined that three of the four conditions set forth in Section 122(f)(1) were already satisfied – namely, that the Decree, including its provisions governing issuance of the Certification and the covenant not to sue: (A) was in the public interest (460 F. Supp. 2d at 404); (B) would expedite the remediation (*id.* at 403); and (D) adopted an EPA-selected remedy (*id.* at 399). As specifically provided in the Consent Decree, the only condition remaining before EPA could issue the Certification of

Completion and trigger the covenant not to sue was the fourth condition required by Section 122(f)(1)(C) – namely, GE's completion of the Remedial Action "in full compliance" with the Decree. *See* CD ¶ 57.d.

The State nevertheless argues that Sections 121(d)(1) and 122(f)(3) of CERCLA are to be interpreted to work in tandem to impute an implied *fifth* requirement – a post-construction finding of protectiveness – that must be satisfied before EPA can issue a covenant not to sue. However, Section 121(d)(1) refers to the "selection" of the remedy, not its implementation; and Section 122(f)(3) simply requires that remedial actions be completed before a covenant is issued, which is exactly what was required by the Consent Decree and what happened in this case. Specifically, Section 122(f)(3) provides: "A covenant not to sue concerning future liability of the United States shall not take effect until [EPA] certifies that remedial action has been completed in accordance with the requirements of [CERCLA] at the facility that is the subject of such covenant." 42 U.S.C. § 9622(f)(3). Contrary to the State's argument that Section 122(f)(3) somehow modifies and expands upon the conditions set forth in Section 122(f)(1), Section 122(f)(3) simply says the same thing as the Consent Decree – that a covenant not to sue shall not take effect until EPA certifies that the remedial action has been completed. CD ¶ 57.d.

The State's argument also ignores the fact that, as discussed previously, Section 122(f)(1) sets forth in detail the conditions that must be met for a settling party to receive a covenant not to sue, such as the one in the Consent Decree, and none of those conditions requires an affirmative post-construction determination that the remedy selected in the ROD has immediately proved to be protective. It is illogical, and defies settled rules of statutory construction, to contend that Congress

would have intended to impose such a significant requirement implicitly when it explicitly listed a set of conditions that did not include such a requirement.[19]

Section 122(f)(5) further confirms that Congress understood how to expressly condition the ability to get a covenant, and did not require a determination of protectiveness as a condition, by stating that "[a]ny covenant not to sue under this subsection shall be subject to the satisfactory performance by such party of its obligations under the agreement concerned." 42 U.S.C. § 9622(f)(5).

Finally, Section 122(f)(6)(A) of CERCLA fully addresses the State's concern that a remedy, initially selected as protective, may ultimately prove not to be protective in fact.[20] It provides an exception to the covenant for future liability based on conditions unknown at the time of the certification. 42 U.S.C. § 9622(f)(6)(A). Consistent with this CERCLA provision, and in recognition of the fact that remediation goals will not be achieved for many years after implementation of the Remedial Action, the Consent Decree requires that, after completion of the Remedial Action, GE must continue to conduct monitoring to evaluate the continued effectiveness of the remedy (CD ¶ 19); and it includes an exception to the covenant, called a "reopener," which provides that, after the covenant is in effect, EPA may seek to require GE to perform additional response actions if new information or conditions are discovered and EPA determines that such information or conditions, together with other relevant information, indicate that the Remedial

---

[19] *See, e.g., Carter v. Welles-Bowen Realty, Inc.*, 736 F.3d 722, 728 (6th Cir. 2013) (a statute's "express inclusion of . . . precise requirements counsels against discovering an additional requirement in the implications of a phrase tucked away . . . elsewhere in the statute").

[20] To be clear, that has *not* happened here. EPA, in the Second Five-Year Review, stated that it could not yet make a final determination of the protectiveness of the remedy, but did not conclude that the remedy is *not* protective. *See* Second Five-Year Review at 9 (in Exhibit D).

Action completed is not protective of human health or the environment. CD ¶ 101.b.[21] This

reopener applies specifically to the five-year reviews under Section 121(c) of CERCLA. CD ¶ 27.

Based on the protections afforded by Section 122(f)(6)(A) of CERCLA and the reopener

provisions of the Consent Decree that are consistent with that statutory provision, there is no basis

to adopt the State's torturous reading of CERCLA to address the possibility that the remedy is

ultimately found to be non-protective; Congress and the Consent Decree have already addressed

that future contingency. In fact, the statutory and Consent Decree reopener provisions would have

little meaning if EPA were required to hold up issuance of a Certification of Completion until it

could determine that the remedy "implemented and to be implemented" (Complaint ¶ 41) is fully

protective of human health and the environment.

### 2. The State's argument contradicts EPA guidance and EPA's positions at the time the Consent Decree was entered.

EPA's guidance on covenants not to sue confirms that the focus of Section 122(f)(3) of

CERCLA is to ensure that the remedial action has been *completed*, not to require an additional,

post-construction finding that the remedy is protective. *Superfund Programs; Covenants Not To

Sue*, 52 Fed. Reg. 28038 (July 27, 1987). That guidance states:

> "Section 122(f)(3) specifies that a covenant not to sue for future liability shall not take
> effect until EPA certifies the remedial action is complete. . . .   EPA interprets
> completion of the remedial action as *that date at which remedial construction has
> been completed*. . . . The exact point when EPA can certify completion of a particular
> remedial action depends on the specific requirements of that remedial action. Each
> consent decree should include a detailed list of those activities which must be
> completed before certification can occur." *Id.* at 28041 (emphasis added).[22]

---

[21] There is no need to speculate on the type of information that would be necessary to meet the
reopener conditions. If that issue ever makes its way to the Court, it will be on the basis of a record
that includes the underlying facts and basis for EPA's determination to trigger the reopener.

[22] Moreover, EPA's website unambiguously defines "construction completion" as "the
completion of physical construction of all cleanup actions," and it states that "Sites qualify for
construction completion when . . . any necessary physical construction is complete, *whether
or not final cleanup levels or other requirements have been achieved*."

When the United States moved to enter the Consent Decree, with full knowledge of CERCLA's requirements and its own guidance, EPA argued forcefully that it was fully consistent with CERCLA.[23] The Court agreed. 460 F. Supp. 2d at 403, 404. This evidences that EPA, the Department of Justice and this Court understood that CERCLA did not impose any additional implicit pre-conditions on EPA's issuance of the Certification of Completion for the Remedial Action to GE, other than GE's completion of the Remedial Action.

Further, despite the plain terms of the Consent Decree, which required EPA to issue the Certification upon GE's completion of the Remedial Action, without any reference to a protectiveness determination, the State never argued that the Consent Decree was inconsistent with CERCLA and did not object to the Court's approval and entry of the Consent Decree. This is evidence that the State shared the common understanding of how the Decree would work – i.e., that if GE did the work required by the Decree, it would receive a Certification of Completion for that work, without a requirement for any other discretionary determination by EPA – and that such a procedure was consistent with CERCLA. *See also* Section II below.

### 3. The State's position is inconsistent with case law.

In *United States v. Akzo Coatings of America, Inc.*, 949 F.2d 1409 (6th Cir. 1991), the State of Michigan challenged entry of a consent decree that granted a broad covenant not to sue to parties that were implementing only the first phase of a two-phase cleanup. The State argued that the consent decree violated Section 122(f)(3) of CERCLA because the covenant would be issued before the completion of the entire remedy and, therefore, before any ultimate protectiveness

---

https://www.epa.gov/superfund/superfund-remedial-action-project-completion-and-construction-completions (emphasis added).

[23] *See* U.S. Mem. in Support of CD Entry (cited in footnote 6 above) at 35-36.

determination could be made. The court rejected that argument, noting that the decree ensured "that the covenant not to sue takes effect only when [the settling parties] have completed *their work*," which "satisfies the congressional intent expressed in section [122(f)(3)]," even though "EPA will continue to clean up the Site." *Id.* at 1452 (emphasis by court).

### 4. The State's position would preclude issuance of a certification of completion until many years after completion of a remedial action, contrary to CERCLA and the Consent Decree.

Finally, if the State's argument were accepted, EPA would be precluded from issuing a certification of completion and a covenant not to sue to a performing party that completed a particular remedial action until years – or even decades – after completion of that remedial action while monitoring data are gathered to confirm the protectiveness of the remedy. That would not be consistent with CERCLA and is directly at odds with the Consent Decree.

At the time the Decree was negotiated and entered, the ROD recognized that achievement of the ROD's remediation goals would take a number of years following the completion of the Remedial Action, as discussed above. Despite this fact, the Decree provided that, upon its completion of the Remedial Action, GE would submit its Remedial Action Completion Report and that, if that report showed that the Remedial Action was completed in accordance with the Decree, EPA would issue a Certification of Completion *within 365 days*. CD ¶ 57.e. This confirms the parties' intent that the Certification would be issued well before the remediation goals are fully met and when it still might be uncertain whether the remedy will turn out to be fully protective. If EPA had to wait for a final determination of protectiveness before issuing the Certification, the Consent Decree's provisions on the conditions and timing for issuance of the Certification after completion of the Remedial Action would make no sense because the Certification might not be issued for many years.

Moreover, accepting the State's position would fundamentally undermine faith in the consent decree process under CERCLA, contrary to an objective of CERCLA "to encourage settlements between EPA and [potentially responsible parties]." *Akzo Coatings*, 949 F.2d at 1450. EPA's CERCLA program depends on private-party funded cleanups, and settling parties need to know that the Government will honor the commitments it makes in settlements. If a party, like GE, honors its commitments under a settlement – at huge effort and cost – EPA must do the same, or risk sending the message to prospective settling parties that they can faithfully discharge their agreed-upon obligations only to be denied the bargained-for benefits of their settlement. A decision directing EPA not to grant the agreed-upon Certification of Completion unless and until EPA can find that the remedy ultimately turns out to be protective will discourage PRPs from devoting the types of resources that GE has devoted to this project. The ability to obtain a covenant not to sue, effective upon completion of the required Remedial Action, is a primary incentive for PRPs to enter into CERCLA settlements. A decision requiring EPA to withhold a certification of completion and thus a covenant not to sue even when the PRP has completed the required remedial work would greatly reduce, if not eliminate, the incentive to settle, since no PRP could be confident that the explicit terms of the consent decree will be honored.[24] Such a result is inconsistent with CERCLA.

---

[24] Moreover, at many sites throughout the country, including other contaminated sediment sites, companies have entered into consent decrees which, like the Hudson Consent Decree, provide for the settling defendant to receive a certification of completion triggering a future liability covenant upon completion of the remedial work, without any other pre-condition, including a separate, post-construction evaluation of protectiveness. A decision requiring EPA not to comply with its Consent Decree obligation here would raise questions about the reliability of such settlements and create uncertainty throughout the remedial program.

## II. THE STATE'S LAWSUIT CONSTITUTES AN IMPERMISSIBLE AND UNTIMELY CHALLENGE TO THE CONSENT DECREE.

The Consent Decree makes EPA's issuance of the Certification of Completion a non-discretionary duty upon GE's completion of the Remedial Action, without regard to any protectiveness finding. Accordingly, although the State characterizes this action as a challenge to EPA's issuance of the Certification, this action in fact constitutes a facial challenge that the terms of the Consent Decree violate CERCLA. Such a challenge is unauthorized by the APA and is untimely. This issue need not be addressed, however, if the Court agrees with Point I that the State has failed to state a claim for relief.

### A. The State's Suit Is Not Authorized by the APA.

The APA provides for relief only if the plaintiff has "no other adequate remedy in a court." 5 U.S.C § 704. *See Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988) (section 704 of the APA "makes it clear that Congress did not intend the general grant of review in the APA to duplicate existing procedures for review of agency action"); *Hinojosa v. Horn*, 896 F.3d 305, 310 (5th Cir. 2018) (section 704 "limits the APA to review of those agency actions which otherwise lack an 'adequate remedy in a court'" and "[t]he adequacy of the relief available need not provide an identical review that the APA would provide, so long as the alternative remedy offers the 'same genre' of relief").

To the extent that the State believes that the Consent Decree is inconsistent with CERCLA by not conditioning the issuance of a Certification of Completion on a post-construction determination of protectiveness, it readily could have made that argument to the Court back in 2005-2006. After the Decree was lodged with the Court, the State (which had participated in the negotiations) could have moved to intervene to object to the Decree on that ground. But it did not. Indeed, the State did not object to the Court's entry of the Decree at all. Alternatively, after entry

of the Decree, the State could have brought an action pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, seeking a declaratory judgment that the Consent Decree violates CERCLA. That statute makes available a declaratory judgment "[i]n a case of actual controversy." 28 U.S.C. § 2201(a).[25] The State did not do that either.

Because the State had an adequate remedy in court to challenge the Consent Decree as violative of CERCLA, it cannot now bring an action under the APA, over a decade later, which in effect presents the same challenge.

### B.    The State's Suit is Time-Barred.

Given that the State's suit constitutes a challenge to the Consent Decree, it is barred by the six-year statute of limitations period in 28 U.S.C. § 2401(a). That statutory provision provides that "every civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues." A claim accrues within the meaning of this statute when the State had the legal ability to challenge agency action and maintain a suit in court. *See, e.g., Manfredonia v. SEC*, No. 08-cv-1678, 2009 WL 4505510, at *6 (E.D.N.Y. Dec. 3, 2009). In this case, the State's claim that the Consent Decree erroneously fails to condition the issuance of the Certification of Completion on a determination of protectiveness accrued back in 2005 when EPA executed the Decree with GE and presented it to the Court for approval. Thus, the six-year limitations period began to run upon EPA's execution of the Consent Decree and certainly no later than the Court's approval of the Consent Decree in 2006, after EPA filed the proposed Decree and moved for its entry.

---

[25] This Court would have had jurisdiction over the matter pursuant to its oversight of the Consent Decree. *See, e.g., United States v. Int'l Bhd. of Teamsters*, 961 F. Supp. 665, 674 (S.D.N.Y. 1997), *aff'd* 119 F.3d 210 (2d Cir. 1997) (district court had jurisdiction over suit for declaratory relief based on its oversight of the consent decree).

Although EPA did not issue the Certification of Completion until 2019, EPA's issuance of that Certification was not a discretionary matter under the Consent Decree. If the State was aggrieved or adversely affected, that impact occurred back in 2005-2006, not in 2019. In the meantime, as the State was well aware, GE was spending hundreds of millions of dollars per year in reliance on the mandatory terms of the Consent Decree promising it a receipt for its remedial work, in the nature of the Certification of Completion. Allowing the State's action to proceed all these years later undermines the very purpose for having a statute of limitations. *See, e.g., United States v. Kubrick*, 444 U.S. 111, 117 (1979) ("Statutes of limitations . . . represent a pervasive legislative judgment that it is unjust to fail to put the adversary on notice to defend within a specified period of time and that the right to be free of stale claims in time comes to prevail over the right to prosecute them").[26]

## CONCLUSION

For the foregoing reasons, GE respectfully submits that the State's complaint should be dismissed because it fails to state a claim on which relief may be granted and is time-barred, with such other and further relief as this Court deems just and appropriate.

---

[26] In addition, although laches is generally not available against a sovereign, there are exceptions to that rule, including "the most egregious instances of laches." *Cayuga Indian Nation of N.Y. v. Pataki*, 413 F.3d 266, 278-79 (2d Cir. 2005). For example, in *United States v. City of Loveland*, 621 F.3d 465, 473-74 (6th Cir. 2010), the court held that a city which sought to attack a prior consent decree to which it was not a party was precluded from doing so by laches and equitable estoppel. The court held the City "forfeited its right to contest the effects of the consent decree by unreasonably sitting on its rights," including "not objecting to the proposed consent decree, declining to participate in the pre-approval hearings, and . . . obtaining its benefits for four years." *Id.* at 474. Similarly, here, the State forfeited its right to contest the effects of the Consent Decree by not objecting to the terms of the Decree, unreasonably sitting on its rights for an egregious period of 13 years, and seeking relief from the plain terms of the Consent Decree only after GE spent more than $1.7 billion in reliance on those plain terms.

Respectfully submitted,

Kristin Carter Rowe
Dean S. Sommer
YOUNG/SOMMER LLC
Five Palisades Drive
Albany, NY 12205
(518) 438-9907
krowe@youngsommer.com
dsommer@youngsommer.com

Samuel I. Gutter
10e Cape Codder Road
Falmouth, MA 02540
(508) 540-0180
sgutter@outlook.com

Eric S. Merrifield
Executive Counsel
General Electric Company
P.O. Box 2049
Poulsbo, WA 98370
(518) 527-5140
eric.merrifield@ge.com

James R. Bieke
Peter D. Keisler
Timothy K. Webster
SIDLEY AUSTIN, LLP
1501 K Street, N.W.
Washington, D.C. 20005
(202) 736-8000
jbieke@sidely.com
pkeisler@sidely.com
twebster@sidley.com

*Attorneys for Intervenor-Defendant General Electric Company*

Dated: November 20, 2019