UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
STATE OF NEW YORK; THE NEW
YORK STATE DEPARTMENT OF
ENVIRONMENTAL CONSERVATION;
and BASIL SEGGOS, as
Commissioner of the New York State
Department of Environmental
Conservation,

                Plaintiffs,

    -v-                              1:19-CV-1029

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY; and
ANDREW R. WHEELER, as
Administrator of the United
States Environmental Protection
Agency,

               Defendants,

and GENERAL ELECTRIC COMPANY,

               Intervenor Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:              OF COUNSEL:

HON. LETITIA JAMES        BRITTANY M. HANER, ESQ.
Attorney General for the       Assistant Attorney General
    State of New York
Attorneys for Plaintiffs       JAMES C. WOODS, ESQ.
The Capitol                 Assistant Attorney General
Albany, New York 12224

HON. ANTOINETTE T. BACON
Acting United States Attorney for the
    Northern District of New York
Attorneys for Defendants
the United States and Andrew R. Wheeler
445 Broadway, Room 218
Albany, New York 12207

JOHN D. HOGGAN, JR., ESQ.
Assistant United States Attorney

U.S. DEPARTMENT OF JUSTICE
ENRD/EES
Attorneys for Defendants
    the United States and Andrew
    R. Wheeler
P.O. Box 7611
Ben Franklin Station
Washington, DC 20044

MEGHAN GREENFIELD, ESQ.

U.S. DEPARTMENT OF JUSTICE
ENRD
Attorneys for Defendants
    the United States and Andrew
    R. Wheeler
4 Constitution Square
150 M Street Northeast
Washington, District of Columbia 20002

SARAH A. BUCKLEY, ESQ.

YOUNG, SOMMER LAW FIRM
Attorneys for Intervenor Defendant
    General Electric Company
Executive Woods
Five Palisades Drive
Albany, New York 12205

DEAN S. SOMMER, ESQ.
KRISTIN CARTER ROWE, ESQ.

SAMUEL GUTTER
Attorneys for Intervenor Defendant
    General Electric Company
10 Cape Codder Road, Apartment E
Falmouth, Massachusetts 02540

SAMUEL GUTTER, ESQ.

ERIC MERRIFIELD                          ERIC MERRIFIELD, ESQ.
Attorneys for Intervenor Defendant
    General Electric Company
P.O. Box 2049
Pulsbo, Washington 98370

SIDLEY, AUSTIN LAW FIRM – DC             JAMES R. BIEKE, ESQ.
Attorneys for Intervenor Defendant       PETER D. KEISLER, ESQ.
    General Electric Company             TIMOTHY K. WEBSTER, ESQ.
1501 K Street, Northwest
Washington, DC 20005

DAVID N. HURD
United States District Judge

## MEMORANDUM-DECISION and ORDER

## I. INTRODUCTION

It is difficult to overstate the importance of the Hudson River (the "Hudson" or the "river") to not only New York City, but to the entirety of New York State ("New York" or "the State").[1]  The Hudson is at once a narrative thread tying the history of the State into a cohesive whole and a geographical shorthand uniting its citizens in the present.  Perhaps it is fitting that a state known so much for a single sprawling city owes so much to a natural feature at that metropolis's feet.

Unfortunately, mixing a mass of humanity with an element of nature all too often leads to the corruption of the latter for the former's sake.  The

---

[1] All three plaintiffs—New York State, the New York State Department of Environmental Conservation, and that agency's Commissioner Basil Seggos—are tied together by their representation of the State's interests.  As a result, the parties' supporting papers refer to the three plaintiffs collectively as the State.  This Memorandum-Decision and Order will do the same.

Hudson has not been spared this fate.  The parties agree that intervenor defendant General Electric Company ("GE") spent the back half of the twentieth century polluting the river with polychlorinated biphenyl ("PCB"), a dangerous chemical compound.  The parties also agree that GE has spent the last few decades dredging the river to undo some measure of the damage it caused.

What *is* disputed is whether GE's cleanup efforts have progressed to the point where it is entitled to be insulated from suit for its role in polluting the Hudson in the first place.  The United States Environmental Protection Agency ("the Government" and together with GE "defendants") and GE entered into a consent decree (the "consent decree") in 2006 to determine GE's penance for its contamination of the river.  That consent decree authorized the Government to enter a covenant not to sue with GE if its cleanup efforts progressed far enough.  The Government and—obviously—GE argue that the cleanup has reached that stage, and that GE is entitled to some protection from future suits.

Indeed, from defendants' perspective, the consent decree commands that the Government make the covenant not to sue.  But New York sees things differently.  From the State's point of view, the covenant not to sue creates possibilities for GE to escape liability for its pollution before remedying the harm it has indisputably caused.

4

On August 21, 2019, New York filed a complaint in this district to settle that issue. The complaint alleges two causes of action under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2), both challenging the Government's decision to issue the covenant not to sue. The state claims that issuing the covenant was both: (I) *ultra vires* in violation of 5 U.S.C. § 706(2)(C); and (II) arbitrary and capricious in violation of 5 U.S.C. § 706(A). Both counts seek declaratory relief in the form of a Court determination that the Government acted impermissibly.

The Government and GE have moved to dismiss the complaint under Federal Rule of Civil Procedure ("Rule") 12(b)(6). New York has opposed the motion and cross-moved for summary judgment under Rule 56. The Government and GE have opposed the State's cross motion, and the government has also cross-moved for summary judgment under Rule 56. Those motions, having been fully briefed, will now be decided on the basis of the parties' submissions without oral argument.

## II. <u>BACKGROUND</u>

Beginning around 1947, GE produced PCBs as a byproduct of its manufacturing enterprises.[2] Dkt. 1 ("Compl."), ¶ 15. Because two of GE's

---

[2] For the purposes of defendants' motion to dismiss, the facts are taken from the complaint and any documents attached to it or incorporated by reference. For the State's and the Government's motions for summary judgment, the facts are taken from the State's statement of material facts to the extent admitted by defendants, or from other record evidence. Disputed facts are flagged and supported by citations to either the proponent's statement of material facts or to record evidence.

manufacturing facilities sat along the Hudson, the river became a natural dumping site for those chemicals. *Id.* According to New York, the intervening decades have seen large amounts of PCB contamination migrate downstream, contaminating the river and its fish from Hudson Falls, New York, all the way down to the Battery in Lower Manhattan. *Id.* ¶¶ 15, 17.

As might be expected, New York had concerns about the spread of PCBs in the Hudson, given the broad range of known health issues these chemicals cause in humans.   In addition to being carcinogenic, PCBs have been found to have a deleterious effect on the immune, reproductive, nervous, and endocrine systems.  Compl. ¶ 16.

In 2002, the Government issued a Record of Decision ("ROD") under the authority vested in it by the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") to compel GE to begin to clean the Hudson.  Compl. ¶ 19; Dkt. 55-18, New York's Statement of Material Facts ("NYSMF") ¶ 1.  That ROD tasked GE with targeted dredging and removal of highly-contaminated sediments to reduce the river's PCB levels. Compl. ¶ 19; NYSMF ¶ 2.  In addition, the Government imposed fish advisories and fishing restrictions to limit public consumption of contaminated river fish.  Compl. ¶ 19; NYSMF ¶ 2.  Finally, the ROD

---

Any fact in this section that is not supported by a citation to a part of the record that can be considered on a motion to dismiss is either only included to set the scene or will only be considered if the Court reaches the parties' summary judgment motions.

required GE to monitor the natural attenuation of PCBs in the river over time.  Compl. ¶ 19; NYSMF ¶ 2.

Among the ROD's objectives was achieving PCB levels among the sediment and fish in the Hudson that would be safe for human consumption and the environment. Compl. ¶ 20; NYSMF ¶ 3. The ROD estimates that a safe level of PCBs in fish would be 0.2 milligrams per kilogram for anglers who eat one half-pound of fish from the river per month, or 0.4 milligrams per kilogram for the average angler, who only eats one half-pound of fish every other month.  Dkt. 55-2 ("ROD"), p. 66.[3]

To help bring about the ROD's objectives, the Government filed a complaint against GE on October 6, 2005.  NYSMF ¶ 5; *United States v. Gen. Elec.*, 460 F. Supp. 2d 395, 400 (N.D.N.Y. 2006).[4]  The resulting lawsuit culminated in the Government and GE entering into the consent decree in 2006.  Compl. ¶ 22; NYSMF ¶¶ 5-6.  The Consent Decree was made available for public comment for a thirty-day period, as required by CERCLA.

---

[3] Pagination corresponds with CM/ECF.  Because the State's complaint references the ROD repeatedly, the ROD is integral to the complaint and the Court will consider it in deciding defendants' motions to dismiss.  *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995) ("[W]hen a plaintiff chooses not to attach to the complaint or incorporate by reference a document upon which it solely relies and which is integral to the complaint, the court may nevertheless take the document into consideration in deciding the defendant's motion to dismiss, without converting the proceeding to one for summary judgment." (cleaned up)).

[4] Similarly, the Court may take judicial notice of the fact of the 2005 litigation's filing without converting defendants' motions to dismiss into motions for summary judgment.  *Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006) ("A court may take judicial notice of a document filed in another court not for the truth of the matters asserted in the other litigation, but rather to establish the fact of [that] litigation and related filings.").

NYSMF ¶ 6.  New York submitted comments to the consent decree but did not contest its terms.  *Id.* ¶ 7.  In the absence of a dissenting voice from the State, the Court adopted the consent decree on November 2, 2006.  *Id.* ¶¶ 6-7; *see* Compl. ¶ 22.

The consent decree tasked GE with performing the work selected by the ROD to resolve the PCB contamination in the Hudson.  *See generally* Dkt. 55-3 ("Consent Decree"), pp. 16-27.[5]  Primarily, that work involved dredging the river to mitigate the ongoing contamination.  *See id.* at 9 (describing initial process of enacting remedy as "season of remedial dredging").

If the Government's looming lawsuit served as a stick motivating GE to complete the burdensome work of dredging and removal, the consent decree offered GE a carrot in the form of a covenant not to sue.  Consent Decree ¶ 98.  But that covenant only takes effect "upon [the Government's] Certification of Completion of the Remedial Action ("Certification of Completion" or "Certification") . . . ."  *Id.* ¶ 99(b).  The consent decree lays out the following procedure for awarding a Certification:

> If [the Government] concludes, based on the initial or any subsequent report requesting Certification of Completion of the Remedial Action and after a reasonable opportunity for review

---

[5] Much as with the ROD, the consent decree is heavily referenced to and quoted from in the complaint.  As a result, to whatever extent the consent decree is not incorporated into the complaint by reference, the Court may nevertheless consider it in deciding defendants' motion to dismiss because it is integral to the complaint.  *Int'l Audiotext*, 62 F.3d at 72.

and comment by [New York] and by the Federal Trustees for
Natural Resources, that the Remedial Action has been performed
in accordance with [the consent decree, the Government] will so
certify in writing to [GE].  This certification shall constitute the
Certification of Completion of the Remedial Action for purposes of
this [consent decree] including, but not limited to, Section XXI
(Covenants Not to Sue by [the Government]).

*Id.* ¶ 57(d).

Three points about the consent decree's covenant not to sue still bear

mentioning.  First, the Government's issuance of a Certification of

Completion "shall not affect [GE]'s remaining obligations" under the consent

decree.  Consent Decree ¶ 57(d).  In other words, the Certification of

Completion is not the finish line for GE's responsibility.  It is only a

milestone.  *See id.*

Second, knowing what a Certification of Completion accomplishes for GE

does not answer what must happen to result in the issuance of a

Certification.  Of course, from the face of ¶ 57(d), it is obvious that GE must

perform the "remedial action," but the exact parameters of what the consent

decree means by a "remedial action" are a touch less intuitive.  *Id.*

Fortunately, the consent decree itself defines the term as: "those activities,

except for Remedial Design and Operation, Maintenance[,] and Monitoring,

to be undertaken to implement the ROD, in accordance with the [statement

of work], the final Remedial Design plans and reports, the Remedial Action

Work Plans, and other plans approved by [the Government]."  Consent Decree p. 12.

Third, even if the Government issues a Certification of Completion, GE is not off the hook.  Under the consent decree, the Government reserved the right to compel GE to shoulder still more of the cleanup through what the parties refer to as a "reopener clause."  Consent Decree ¶ 101(a).  However, the post-Certification reopener clause can only be triggered if: (1) conditions or information are discovered that were previously unknown to the Government; and (2) the Government determines that those changed conditions or new information indicate that the work undertaken is not protective of human health or the environment.  *Id.*

The word "protective" as a benchmark is integral enough to this case that it merits some definition.  The Government uses a five-level Protectiveness rating to determine the state of a cleanup and the extent to which more work must be done.  Dkt. 55-16, pp. 2-5.[6]  Those five levels are: (1) Protective, which means that all risks are currently in control and are expected to be in the future; (2) Short-Term Protective, which means the risks are currently under control but there is a suggestion they will not be permanently; (3) Will

_____

[6] The Court may also take judicial notice of published government sources, especially where those sources provide a definition to a term that is essential to the State's claims yet undefined by the complaint.  *See, e.g.*, *Abely v. Aeterna Zentaris Inc.*, 2013 WL 2399869, at *21 (S.D.N.Y. May 29, 2013) (taking judicial notice of agency's definition of term for motion to dismiss where term was integral to complaint but not defined by complaint).

be Protective, which means that the remedy is expected to achieve a
Protective rating; (4) Protectiveness Deferred, which means that the
Government lacks the requisite information to assign a specific
Protectiveness rating; and (5) Not Protective, which means that the evidence
suggests that the risks are not under control and will not be under the
current remediation plan. *Id.*

Between 2009 and 2016, GE toiled away with the dredging project
assigned to it by the consent decree. Compl. ¶¶ 23, 26; *see* NYSMF ¶ 15. GE
applied for a Certification of Completion in December of 2016 once its
affirmative dredging work was complete. Compl. ¶ 26; NYSMF ¶¶ 15-16.
The Government was not satisfied with GE's initial report and requested that
GE revise it. NYSMF ¶ 16. In March of 2019, GE submitted a report revised
to meet the Government's requirements. *Id.* The Government issued GE's
Certification of Completion on April 11, 2019. Compl. ¶ 2; NYSMF ¶ 17.

New York objected to the Government's issuing the Certification of
Completion. Compl. ¶¶ 3, 27; NYSMF ¶ 23. Principally, the State argues
that GE's cleanup efforts have not yet reached the level of Protectiveness
required by CERCLA, because the five-year report from April of 2019 only
made a finding of Protectiveness Deferred. *See* Compl. ¶¶ 25, 27, 33;
Dkt. 55-5, p. 88 (Government deferring determination of Protectiveness in
five-year report on efficacy of cleanup in 2019 because data cannot

conclusively prove Protectiveness goals will be reached until data collected in 2024 is evaluated in 2025).

Ultimately, New York alleges that the Government violated CERCLA by awarding GE a Certification of Completion before making a finding that the remedy in place for the Hudson is Protective.  Compl. ¶¶ 43, 47.  The State argues that the Government needed to make a Protective finding before granting a covenant not to sue and therefore acted absent statutory authority—or alternatively arbitrarily and capriciously—for granting the Certification in the absence of that finding.  *Id.*

As previously noted, New York brought the present complaint on August 21, 2019, seeking a declaration that the Government exceeded its authority in issuing the Certification.  Compl. ¶¶ A-E.  On October 22, 2019, GE intervened as a defendant to help defend the Government's issuance of the Certification of Completion.  Dkt. 38.  On November 20, 2019, both the Government and GE moved to dismiss New York's complaint under Rule 12(b)(6).  Dkts. 43; 44.  On February 20, 2020, the State cross-moved for partial summary judgment under Rule 56.  Dkt. 55.  Finally, the Government cross-moved for partial summary judgment in under Rule 56 on May 15, 2020.  Dkt. 87.

## III. <u>LEGAL STANDARD</u>

### A. <u>Motion to Dismiss</u>

To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  That factual matter may be drawn from "the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010).

Importantly, "the complaint is to be construed liberally, and all reasonable inferences must be drawn in the plaintiff's favor." *Ginsburg v. City of Ithaca*, 839 F. Supp. 2d 537, 540 (N.D.N.Y. 2012) (citing *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002)).  If the complaint and its additional materials—when viewed through that pro-plaintiff lens—are not enough to raise the plaintiff's right to relief on a claim above the speculative level, that claim must be dismissed.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

### B. <u>Motion for Summary Judgment.</u>

Summary judgment under Rule 56 is warranted if the entirety of the parties' submissions show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

*Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (citing

FED. R. CIV. P. 56(a)).  A fact is "material" if it "might affect the outcome of

the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 248 (1986).  And a dispute of a material fact is "genuine" if "the

evidence is such that a reasonable jury could return a verdict for the

nonmoving party." *Id.*  The movant bears the burden of pointing the court to

the materials that it believes demonstrate the absence of a genuine issue of

material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Additionally, a court considering a summary judgment motion "must

resolve any ambiguities and draw all inferences from the facts in a light most

favorable to the nonmoving party." *Ward v. Stewart*, 286 F. Supp. 3d 321,

327 (N.D.N.Y. 2017) (citing *Jeffreys v. City of New York*, 426 F.3d 549, 553

(2d Cir. 2005)).  Even so, a non-movant's conclusory allegations without

support from record evidence are insufficient: the non-movant must "put up

or shut up." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000).  At

bottom, summary judgment tasks the Court with assessing the assembled

evidence and determining whether a reasonable factfinder could find in the

nonmovant's favor. *Treglia v. Town of Manlius*, 313 F.3d 713, 719

(2d Cir. 2002).

## IV. <u>DISCUSSION</u>

New York argues that the Government violated the APA when it issued the Certification of Completion to GE.  The State levies two potential APA claims: (1) the Government acted *ultra vires* in issuing the Certification; and (2) the Government acted arbitrarily and capriciously in the same act.[7]

### A. *<u>Ultra Vires</u>*

On the first point, New York's attempt to prove that the Government's action in this case was *ultra vires* must overcome the deference traditionally afforded to the actions of a federal agency.  *United States v. Mead Corp.*, 533 U.S. 218, 227 (2001).  In this case, the State must follow the two-step analysis required by *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc* to overcome the deference that decision outlines.[8]  467 U.S. 837, 842-43 (1984). The first step asks "whether Congress has directly spoken to the precise question at issue."  *Id.*  If it has, then Congress's word is, literally, the law. *Id.*

---

[7] The motions presently before the Court come in two forms: (1) a motion to dismiss under Rule 12(b)(6); and (2) a motion for summary judgment under Rule 56.  Functionally, both forms require the Court to engage in statutory analysis of CERCLA and contractual analysis of the consent decree.

[8] A lesser standard of deference is sometimes appropriate.  *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944) (noting that interpretations of law by administrator "while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance").  However, the higher standard of *Chevron* deference is appropriate for two, independent reasons.  First, the State's papers assume that it does.  Second, agency decisions which are traditionally afforded *Chevron* deference are of a similar flavor to the Government's issuance of the Certification.  *Cf. Delaware Dep't of Nat. Resources & Env't Control v. EPA*, 895 F.3d 90, 100-102 (D.C. Cir. 2018) (affording *Chevron* deference to the Government's reliance on states issuing Certifications of Completion under Clean Water Act because the Government was acting "under unwieldy and science-driven statutory scheme[ ]").

If, however, "the statute is silent or ambiguous with respect to the specific issue," the court moves on to the second step and considers whether the agency's action is "based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843. An agency's interpretation of a law that Congress has explicitly empowered it to interpret must be upheld unless that interpretation is "arbitrary, capricious, or manifestly contrary to the statute." *Id.* at 844. However, if Congress's grant of authority to construe a statute is only implicit, an agency's interpretation of that statute must be a reasonable one.[9] *Id.*

New York first argues that the Government exceeded its authority under CERCLA. The State contends that the Government contravened CERCLA's express terms by granting the Certification of Completion without first determining that GE's labors had produced a Protective remedy. To get a fair look at that question, the Court must first delve into some relevant portions of CERCLA.

CERCLA is a remedial scheme designed to encourage the prompt and effective cleanup of hazardous waste sites. *Niagara Mohawk Power Corp. v.*

---

[9] The parties do not address the issue of whether CERCLA grants implicit or explicit authority for the Government to interpret its terms. However, the Second Circuit has considered whether the Government's interpretations of CERCLA are reasonable in considering whether that interpretation is due *Chevron* deference. *B.F. Goodrich Co. v. Murtha*, 958 F.2d 1192, 1205 (2d Cir. 1992) (noting that courts should defer to Government's "reasonable construction of CERCLA"). For the purposes of defendants' motions to dismiss, the Court will assume the reasonableness requirement applies in this case.

*Chevron U.S.A., Inc.*, 596 F.3d 112, 120 (2d Cir. 2010).  The overarching procedures and objectives of a CERCLA cleanup are laid out in 42 U.S.C. § 9621 ("§ 9621"), appropriately titled "Cleanup standards."

As New York repeatedly points out, that section requires that any "[r]emedial action[ ] selected under this section or otherwise required or agreed to by the President under [CERCLA] shall attain a degree of cleanup of hazardous substances, pollutants, and contaminants released into the environment and of control of further release at a minimum which assures protection[10] of human health and the environment."  42 U.S.C. § 9621(d).  According to the State, this "assures protection" language means that a "remedial action" cannot be considered complete until the Government makes a finding that the site is fully Protective.

But CERCLA itself also defines a "remedial action."  42 U.S.C. § 9601(24) ("§ 9601").  Specifically, remedial actions are "those actions consistent with permanent remedy" which include, but are not limited to, "such actions at the location of the release as storage, confinement, perimeter protection . . . and

---

[10] The Court will refer to the EPA's five levels of Protectiveness using the capitalized term Protective.  However, it does not necessarily follow that the EPA means for its levels of Protectiveness to correspond with CERCLA's requirement that a remedial action "assure [ ] protection."  42 U.S.C. § 9621(d).  The matter is unbriefed, and the Court expresses no opinion.  In any case, to ensure that the concepts of CERCLA's "assures protection" requirement and the EPA's levels of Protectiveness remain distinct, the Court will refer to CERCLA's protectiveness requirement in the lowercase.

any monitoring reasonably required to assure that such actions protect the public health and welfare and the environment." *Id.*

CERCLA empowers the Government to enter into settlements and consent decrees with parties responsible for contamination. 42 U.S.C. § 9622(a) ("§ 9622"). As relevant here, those consent decrees may include covenants not to sue. *Id.* at ¶ 9622(f)(1). To install a covenant not to sue into a consent decree, that covenant must meet four conditions: (1) the covenant must be in the public interest; (2) the covenant must expedite a response action consistent with CERCLA; (3) the party must be in full compliance with a consent decree; and (4) the response action must have been approved by the president. *Id.* § 9622(f)(1). Additionally, before a potential covenant not to sue can take effect, the party must have completed a "remedial action" in accordance with CERCLA. *Id.* § 9622(f)(3).

Within the first condition that the covenant must be in the public interest are seven factors the Government must consider: (1) the effectiveness and reliability of the remedy compared to alternative remedies; (2) the nature of the remaining risks at the facility; (3) the extent to which performance standards are included in the decree; (4) the extent to which the response action affords a complete remedy for the facility; (5) the demonstrable effectiveness of the response action's chosen technology; (6) whether funding would be available for any additional remedial actions that might be

necessary at the facility; and (7) whether and to what extent the remedial

action will be carried out by the responsible parties themselves.

42 U.S.C. § 9622(f)(4).

Now that that considerable statutory backdrop has been set, it helps to

consider the logical thread stitching New York's claims together.  Essentially,

the State contends that § 9621(d) requires that a "remedial action" cannot be

complete until and unless it brings about a "protective result."  The State

would define a protective result as a finding of Protective, the highest

standard the Government recognizes, which demands that all present and

future risks at a site be under control.   Dkt. 55-16, pp. 2-5.

From there, New York argues that  because § 9622(f)(3) requires that a

settling defendant have completed a "remedial action" before a covenant not

to sue can take effect, the Government must have made an affirmative

Protective finding before a settling defendant can be safe from suit.

Therefore, the State contends that it was unlawful for the Government to

issue the Certification of Completion—and as a consequence a covenant not

to sue—without GE's efforts having successfully achieved Protective status

for the Hudson.

New York's reading of CERCLA is not entirely implausible.  It is a

complicated statute with a number of moving parts, and so it is possible that

Congress meant to impose a demanding protectiveness requirement, even if it

only did so through the series of inferences upon which the State relies.

However, the State's burden in pleading or proving a claim of *ultra vires*

agency action is not satisfied by merely presenting a plausible interpretation

of CERCLA.  Instead, the State must establish either: (1) clear statutory

language contrary to the Government's chosen action or else that (2) the

Government's action was not based on a reasonable construction of CERCLA.

*Chevron*, 467 U.S. at 842-44.

Even for the purposes of a Rule 12(b)(6) motion, New York has failed to

plausibly allege either step of the *Chevron* analysis.  First, contrary to the

State's arguments, CERCLA does not directly speak on whether there is a

requirement that a remedial action must achieve the highest rating of

Protective status (or whatever lesser standard of protectiveness § 9621(d)

might alternatively contemplate) before it can be considered complete.  The

State has outlined a series of inferences that allow a reader to come to that

conclusion, but there is a world of difference between a possible pattern of

interpretive dominoes falling into place and a direct statutory command.

Obviously, if inferences or reliance on canons of construction compel a

court to reach a particular outcome, then *Chevron* deference has no place in

statutory interpretation.  *Epic Sys. Corp. v. Lewis*, --- U.S. ---, 138 S. Ct. 1612,

1630 (2018) ("Where . . . the canons supply an answer, *Chevron* leaves the

stage." (internal citations and quotation marks omitted)).

20

However, in this case the canons of construction at best cast doubt on New York's interpretation of CERCLA. In particular, the Supreme Court has long been "hesitant to adopt an interpretation of a congressional enactment which renders superfluous another portion of that same law." *United States v. Jicarilla Apache Nation*, 564 U.S. 162, 185 (2011) (citing *Mackey v. Lanier Collection Agency & Serv., Inc.*, 486 U.S. 825, 837 (1988)). New York's interpretation of CERCLA would render superfluous the vast majority of the factors that CERCLA itself requires the Government to consider in creating the potential for a covenant not to sue.

For example, why would the Government ever need to consider any performance standards in a consent decree if a covenant not to sue is only triggered when the cleanup has been performed so thoroughly that all conceivable known future risks for the site have already been eliminated?[11] *See* 42 U.S.C. § 9622(f)(4)(C) (requiring that Government consider performance standards in consent decree before including covenant not to sue). Or why would the Government ever need to consider whether the response action provides a complete remedy if the remedy *must* be complete for a covenant not to sue to take effect? *See id.* § 9622(f)(4)(D).

---

[11] Of course, Congress's intended definition of "protective" may differ from the Government's. But Congress declined to provide a definition for "protective" under CERCLA. *See generally* 42 U.S.C. § 9601, *passim*. The Court is therefore obligated to rely on the Government's chosen definitions in the absence of any suggestion that they are unreasonable.

One response might be that § 9622(f)(4)'s factors only concern eligibility for a covenant not to sue on the front end and have nothing to do with the issue of when such a covenant may take effect.  Even if New York did raise that objection, the simple fact that the Government is required to think about these factors in the process of including a potential covenant not to sue in a consent decree suggests latitude in its ability to determine when a remedial action is complete.

Otherwise, if the Government were so constrained as to only be able to fully enter a covenant not to sue upon the site's reaching absolute Protectiveness, the Government would have no need to set the terms of that covenant, because a required finding of Protective status would swallow any terms the Government would impose.  The responsible party in all cases would only be insulated from suit when the site had become Protective, and the factors laid out in § 9622(f)(4) would be largely beside the point.

The Court is similarly unpersuaded by New York's insistence that § 9621(d)(1)'s language compelling the Government to select a remedial action that will attain a protective result necessarily means that all remedial actions must attain that protective result before being complete.  To begin, if Congress had wanted to demand a protectiveness finding for every remedial action, it could have defined a remedial action as including a finding of

protectiveness.  42 U.S.C. § 9601(24).  It did not.  *See id.* (defining remedial action without invoking protectiveness).

Moreover, as the Government correctly argues, the State is reading more into CERCLA than its text alone affords.  True, § 9621(d)(1) requires that a remedial action "shall attain" protectiveness, but that is not the same as a requirement that a remedial action shall not be complete until the Government certifies that protectiveness has been achieved, let alone that the site has become fully Protective.

The first form contemplates the possibility that the remedial action could be complete before protectiveness is achieved, so long as the remedial action is designed toward achieving protectiveness and would be deemed a failure if protectiveness is never reached.  To illustrate with legal terms, New York would read CERCLA to say that the site's reaching protectiveness is a condition precedent to the remedial action being considered complete.

But all that the phrase "shall attain" actually requires is that the remedial action be the cause of the site reaching a state of protectiveness.  Causes need not—and in practical terms rarely do—post-date the effect that the cause brings about.  Accordingly, § 9621(d)(1) ties the remedial action to protectiveness as a cause, but it does not dictate a timeline to bring that protectiveness about.

In short, CERCLA does not squarely impose a requirement of a finding of protectiveness before a remedial action may be considered complete. *See Chevron*, 467 U.S. at 842-43. For New York's claims to survive, then, the State must have plausibly alleged that the Government's interpretation of CERCLA is at the least not an unreasonable reading of the statute. *See id.* The State has failed to do so.

New York still argues that the Government acted unreasonably because its issuance of the Certification violated CERCLA's objectives. Specifically, the State claims that issuing the Certification before the site is Protective frustrates the Government's ability to ensure that GE will be held liable for the prompt and effective cleanup of the PCBs dumped into the Hudson. *See In re Cuyahoga Equip. Corp.*, 980 F.2d 110, 119 (2d Cir. 1992) (noting objectives of CERCLA including "to encourage prompt and effective responses to hazardous waste releases and to impose liability on responsible parties").

Those concerns are unfounded. Far from the complete absolution New York would have the Court believe the Certification of Completion represents, the Certification changes little about GE's responsibilities to complete the Hudson cleanup. The consent decree specifically notes that even after the Certification issues, GE's obligations to maintain the river remain unchanged. Consent Decree, ¶ 57(d). Moreover, even if the future reveals that GE's labors so far will not bring about Protectiveness, the

reopener clause ensures that the Government will still be able to hold GE liable and compel it to complete the cleanup.  *Id.* ¶ 101.

Even so, New York objects that the reopener clause may prove toothless because that clause depends on new information coming to light.  Consent Decree, ¶ 101(a)(1) (requiring information or conditions "previously unknown" to Government before reopener clause is operable).  The State argues that because the Government already knows that PCB levels are higher than anticipated,[12] Compl. ¶¶ 29-32.  GE will be able to challenge the Government's ability to rely on new information when it already knew that the PCB levels were unexpectedly high.

But given the information available to the Government today, the most it can say is that it does not know whether the remedial action currently in place is Protective.  Compl. ¶ 33 (noting that Protectiveness finding for Hudson cleanup must be deferred).  By necessity, any change from Protectiveness Deferred to Not Protective would have to rely on new data, in which case it is not unreasonable for the Government to believe that the reopener clause would continue to ensure that GE effectively cleans the Hudson.  As a result, the State's argument that the issuance of the Certification of Completion is contrary to CERCLA's objectives does not move

---

[12] The parties dispute whether that is an accurate assessment, but for the purposes of a Rule 12(b)(6) motion the Court must take the facts in the State's complaint and view them in the light most favorable to it.  Compl. ¶¶ 29-32.

the needle on whether issuing the Certification was a reasonable interpretation of CERCLA.

A better argument might be that § 9601(24) specifically includes "any monitoring reasonably required to assure that such actions protect the public health and welfare and the environment." By extension, the State could have argued that the consent decree's deliberate exclusion of monitoring activities from its definition of a remedial action demonstrates that the consent decree's definition of a remedial action differs from CERCLA's. But New York did not raise that argument.[13]

The Court is satisfied as a matter of law that the Government did not unreasonably construe CERCLA in deciding not to include ongoing maintenance and monitoring in its definition of a remedial action in this case. First, as the Government points out, the definition of a remedial action in § 9601(24) is a non-exhaustive list, intended to provide examples of what could constitute a remedial action. It would lead to absurd results to require every activity listed in § 9601(24) in all cases, or even in all cases where that activity is potentially useful.

It also bears repeating that § 9622(f)(4)'s list of factors the Government must consider in including a covenant not to sue in a consent decree suggests

---

[13] Of course, this line of argument would require the State to acknowledge that it is, in fact, challenging the consent decree. The State would likely be reluctant to make that concession because of the procedural hurdles that will be discussed in Section IV(C) below.

26

that there is some flexibility in the Government's ability to grant that covenant. In turn, that flexibility must extend to the Government's capacity to frame a remedial action, because a covenant not to sue cannot take effect until the remedial action is complete. 18 U.S.C. § 9622(f)(3).

Importantly, the Sixth Circuit seems to agree that the Government may enter into a CERCLA consent decree that would result in a covenant not to sue taking effect before the responsible party finishes monitoring the cleanup. *See United States v. Akzo Coatings of Am., Inc.*, 949 F.2d 1409, 1451 (6th Cir. 1991). In *Akzo*, the Sixth Circuit upheld a consent decree despite a challenge from Michigan arguing that that consent decree's covenant not to sue violated § 9622(f)(3) because it left some tasks to be completed by the defendant after the covenant took effect. *Akzo*, 949 F.2d at 1451.

If that argument did not already sound familiar enough, Michigan's objection to the consent decree was that the covenant not to sue would kick in while the defendant maintained an ongoing responsibility to monitor the effectiveness of the remedial action. *Akzo*, 949 F.2d at 1451. The Sixth Circuit overruled that objection. *Id.* Crucial to that determination was the consent decree's inclusion of other protections to ensure that the settling defendants would remain liable even after being granted the covenant not to sue if by some twist of fate the planned remedial action proved ineffective. *Id.* at 1452.

*Akzo* strongly supports the conclusion that the Government's interpretation of CERCLA and the consent decree is reasonable.  *Akzo*, 949 F.2d at 1451-52.  Accordingly, the Government's interpretation of CERCLA as allowing it to issue the Certification of Completion is a reasonable one. New York has failed to plausibly allege that the Government either directly contravened Congress's will or impermissibly interpreted CERCLA, as required for it to overcome *Chevron* deference.  467 U.S. at 842-44.

Consequently, on the face of the pleadings and as a matter of law, the State has failed to plausibly allege that the Government's issuing the Certification was *ultra vires*.  As a result, Count I of the State's complaint must be dismissed under Rule 12(b)(6).  *See, e.g.*, *Akzo*, 949 F.2d at 1451-52 (upholding consent decree's grant of covenant not to sue which takes effect when "settling defendants have completed their obligations under the agreement, *aside from long[-]term monitoring requirements*").

## B. Arbitrary and Capricious

For its second claim, New York argues that the Government acted arbitrarily and capriciously in issuing the Certification of Completion.  An agency accused of acting arbitrarily and capriciously must be able to articulate a satisfactory explanation for an action based on an examination of the relevant data.  *Islander E. Pipeline Co. v. Conn. Dep't of Env't Prot.*, 482 F.3d 79, 94-95 (citing *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto.*

*Ins. Co.*, 463 U.S. 29, 42-43 (1983)).  "In reviewing that explanation, [courts] must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *State Farm*, 463 U.S. at 43 (internal citation and quotation marks omitted).

In other words, an agency decision is arbitrary and capricious if the agency: (1) has relied on factors other than those identified by Congress; (2) failed to consider an important aspect of the problem; (3) acts contrary to the evidence before it; or (4) acted so implausibly that a difference in viewpoint or agency expertise could not have caused the outcome.  *State Farm*, 463 U.S. at 43.

Similarly, "an unexplained inconsistency in agency policy is a reason for holding an interpretation to be an arbitrary and capricious change from agency practice." *Encino Motorcars, LLC v. Navarro*, --- U.S. ---, 136 S. Ct. 2117, 2126 (2016).  Of course, the converse is also true: a well-reasoned change in policy is not arbitrary and capricious simply by virtue of reflecting a change. *See id.* at 2125-26.

New York raises precious few new bases for relief on its second claim.  At its heart, the State argues that the Government "shift[ed] the responsibility for an effective cleanup from [GE] to the general public[.]"  But the Certification of Completion did nothing of the sort.  Certification or no, the obligation to finish the cleanup remains with GE.  Consent Decree ¶ 57(d)

("Certification of Completion of the Remedial Action shall not affect [GE's] remaining obligations under this [c]onsent [d]ecree.").  The only circumstance in which that obligation might fall upon the State or its citizens is through the hypothetical possibility that a future court could allow GE to escape the reopener clause.  That has not come to pass, and for the reasons discussed above, it is unlikely that it ever will.

Having failed in its own affirmative arguments, New York's allegations also fail to provide any indication that the Government behaved in any way out of the ordinary in this case.  There are no allegations of an unexplained inconsistency between the Government's conduct here and its typical management of a CERCLA settlement.  *Navarro*, 136 S. Ct. at 2126.  Quite the contrary, the Government has entered into similar consent decrees in the past that grant covenants not sue before final monitoring is complete.  *See Akzo*, 949 F.2d at 1451-52 (upholding consent decree granting covenant not to sue prior to completion of defendant's monitoring obligations).

New York has also failed to allege that the Government considered any factors that it should not have or failed to consider any factors that it should have.  *State Farm*, 463 U.S. at 43.  Reading the entirety of the complaint in the light most favorable to the State, it has simply failed to allege any clear error in judgment by the Government in issuing the Certification prior to a determination of Protective status.  *Id.*  Count II of the complaint must

therefore also be dismissed, and the complaint must be dismissed in its entirety.

## C. **Proper Mechanism to Challenge a Consent Decree**

Even if New York's complaint had been of some merit, however, the State's challenge to the consent decree was also procedurally improper. "Consent decrees have elements of both contracts and judicial decrees." *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 437 (2004) (internal citations and quotation marks omitted). As such, the court approving the decree "retains the authority, and the responsibility, to make further amendments to [an] existing order or any modified decree it may enter as warranted by the exercise of its sound discretion." *Brown v. Plata*, 563 U.S. 493, 542 (2011).

However, in the Second Circuit, "[i]t is well[-]settled that collateral attacks on consent decrees . . . are not permitted[.]" *Marino v. Ortiz*, 806 F.2d 1144, 1146 (2d Cir. 1986), *aff'd by equally divided court*, 484 U.S. 301, 304 (1988). Instead, a challenger's only remedy is to intervene in the case in which the consent decree was approved and seek to modify the consent decree from within. *Marino*, 806 F.2d at 1146.

New York insists that it is not challenging the consent decree itself so much as the Government's implementation of the consent decree. As such,

the State believes that it need not intervene in the original suit to compel the Government to rescind the grant of the Certification of Completion.

New York is wrong. The consent decree states in no uncertain terms that "[i]f [the Government] concludes . . . that the [r]emedial [a]ction has been performed in accordance with [the consent decree, the Government] *will* so certify in writing to [GE]." Consent Decree ¶ 57(d) (emphasis added). The consent decree also defines the term "remedial action" with the same clarity; the remedial action includes "those activities, except for Remedial Design and Operation, Maintenance[,] and Monitoring, to be undertaken to implement the ROD, in accordance with the [statement of work], the final Remedial Design plans and reports, the Remedial Action Work Plans, and other plans approved by [the Government]." *Id.* at 12.

Synthesizing those fragments of quoted language leaves little doubt that the Government was not only empowered by the consent decree to issue the Certification of Completion, but was compelled to do so. The consent decree states that the Government "will" issue a Certification if GE completes the remedial action, and the consent decree defines the remedial action as specifically excluding maintenance and monitoring. Consent Decree, p. 12, ¶ 57(d).

In other words, as much as New York would like to frame this case as one challenging the Government's implementation of the consent decree rather

32

than challenging the consent decree itself, the Government had no discretion in issuing the Certification of Completion.  The consent decree defined when the Certification should be issued.  That timeline is phrased in mandatory terms and backed by judicial force.  By extension, the only way the State could have successfully challenged the Government's decision to issue the consent decree would have been to prove that the consent decree itself violated CERCLA.

New York tries to avoid that inevitable conclusion through an argument that the Court must read the consent decree so as to incorporate CERCLA's full requirements.  In the State's view, it is not challenging the consent decree because the consent decree implicitly includes a requirement of a finding of protectiveness before the covenant not to sue can take effect.

However, "the scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it or by what might have been written had the plaintiff established his factual claims and legal theories in litigation."  *Firefighters Local Union No. 1784 v. Stotts*, 467 U.S. 561, 574 (1984) (internal citations and quotation marks omitted).

The Court would therefore be incapable of considering material beyond the consent decree's text, and the State's arguments would fail.  In other words, over and above the frailty of New York's claims on their merits, they were

33

also procedurally improper and must be dismissed on this alternative basis as well.

## V. <u>CONCLUSION</u>

New York's motives in bringing this case were good ones. The State felt that its environmental health was put at risk by circumstances beyond its control and tried to take some of that control back. However, the State passed up an opportunity to correct the language of the consent decree before it was first adopted. And when the outcome to which the State objects came to pass, the State did not attempt to correct that outcome through the proper procedures. This lawsuit comes too late and based on improper theories. It must therefore be dismissed.

Yet the Court would be remiss if it did not stress that its decision in this case comes from a place of assurance that GE remains responsible for the cleanup of the Hudson going forward. The consent decree is clear that GE's obligations for the cleanup remain undisturbed. And in the event that the Government determines that the river was not adequately cleaned by GE's efforts, the language of that consent decree leaves a clear opening for the Government to come after the company with the full force of the law to see the job done. Notwithstanding New York's overreaction to the Government's issuance of the Certification of Completion, the Court remains dedicated to

upholding the purpose of the consent decree issued under its authority and

seeing those responsible for the river's soiling correct the harm they caused.

Therefore, it is

ORDERED that

1. Defendants' motions to dismiss the complaint are GRANTED;

2. Plaintiffs' cross-motion for partial summary judgment is DENIED;

3. The Government's cross-motion for partial summary judgment is

DENIED as moot; and

4. The complaint is dismissed in its entirety.

5. The Clerk of the Court is directed to enter judgment accordingly and

close the case file.

IT IS SO ORDERED.

Dated: March 11, 2021
   Utica, New York.

David N. Hurd
U.S. District Judge